CONTINENTAL TRUST CO. et al. v. TOLEDO, ST. L. & K. C. R. CO.

(Circuit Court, N. D. Ohio, W. D. September 18, 1897.)

No. 1,205.

1. FEDERAL COURTS — ANCILLARY JURISDICTION — MORTGAGE FORECLOSURE — POSSESSION OF RES.
    A federal court has ancillary jurisdiction of a mortgage foreclosure suit, irrespective of the citizenship of the parties, where all the property affected is already in its possession through its receiver in another suit.

2. SAME—ANCILLARY JURISDICTION—PLEADING AND PRACTICE.
    The dependence of an ancillary upon an original suit for purposes of jurisdiction does not throw both suits into hotchpot, and dispense with the ordinary rules of pleading and practice as to parties proper and necessary to each cause of action. Parties to the original bill are not thereby made parties to the dependent bill, nor have they any more right to intervene in the dependent cause than if the court had independent jurisdiction thereof. And the dependent cause is proceeded in without regard to the pleading or course of the principal suit.

3. CONSOLIDATION OF CAUSES—ORIGINAL AND ANCILLARY SUITS.
    Original and ancillary suits should be consolidated, where no one will be injured thereby and where their nature permits, as in the case of a creditors' bill and a foreclosure bill against the same insolvent railroad corporation.

4. SAME—PARTIES.
    A receiver appointed in a creditors' suit against an insolvent railroad company is not a proper party to an ancillary suit against the same company to foreclose a mortgage on the property in his hands.

5. CREDITORS' BILL—PRACTICE — HEARING OF CLAIMS — ADVERTISEMENT BY MASTER.
    In a creditors' suit against an insolvent railroad company, it is the proper practice to require the master to advertise the hearing of claims against the company, fixing a time for their presentation in his office, and a time for hearing objections to the same.

6. EQUITY PLEADING—INTERVENING PETITIONS—RESTRICTIONS BY THE COURT.
    Where intervening petitions are filed without leave in a railway mortgage foreclosure suit three years after they might have been tendered, and where the delay has the appearance of laches, it is in the discretion of the

court to determine how much of such petitions may be regarded as making proper issues for the bondholders to meet.

7. CONSOLIDATION OF CAUSES—CREDITORS' BILL AND FORECLOSURE SUIT—IN-TERVENING PETITIONS.

The consolidation of a creditors' bill against a railroad company with an ancillary foreclosure suit does not so merge the former into the latter as to prevent general creditors from contesting the validity or amount of the mortgage lien.

8. CREDITORS' BILL—INTERVENING CREDITORS—PLEADING.

While an intervening creditor cannot defeat the judgment claim upon which the bill is founded and the court obtains jurisdiction, he is not concluded by collateral averments in the bill which concede the validity of certain bonds and mortgages affecting the property, and he is therefore free to attack the validity thereof.

9. SAME—SUIT AGAINST CORPORATION—RIGHTS OF INTERVENERS.

In a creditors' suit against a corporation, an intervening creditor cannot urge against the claim of mortgage bondholders the invalidity of the bonds, on the ground that the corporation never had any legal existence, since, if this were true, the interveners' debt would have no more validity than the bonds, and the court would have nothing upon which to exercise its jurisdiction.

10. DE FACTO CORPORATIONS—RIGHTS OF CREDITORS AND BONDHOLDERS—ES-TOPPEL.

Creditors of a de facto corporation who have dealt with it as a corporation, and whose claims have arisen after the issuance of mortgage bonds, are estopped from attacking the validity of its organization for the purpose of invalidating such bonds and mortgage.

11. SAME—HOW ARISING.

When persons assume to act as a body, and are permitted by acquiescence of the public and the state to act, as if they were a legal corporation of a particular kind, for the organization, existence, and continuance of which there is express recognition by general law, such a body of persons is a corporation de facto, though the individuals thus exercising the franchise may have been ineligible or incapacitated by law to do so.

12. CONSOLIDATION OF RAILROAD COMPANIES—STATUTORY AUTHORITY.

In the Illinois statute authorizing certain railroad companies to "purchase" the franchises, etc., of other railroad companies (3 Starr & C. Ann. St. [2d Ed.] p. 3241, par. 33), the term "purchase" contemplates a consolidation.

13. SAME.

Rev. St. Ohio, § 3380, authorizing the consolidation of certain Ohio railroad companies with certain railroad companies in "adjoining" states, authorizes the consolidation of an Ohio corporation with an Indiana corporation and an Illinois corporation.

14. CORPORATIONS—RIGHTS OF CREDITORS—IMPEACHMENT OF CONTRACT.

Creditors of a corporation, who became such after an agreement or settlement effected in its behalf, cannot impeach the same for fraud, where no stockholder or officer of the company has taken steps to procure relief, and where the transaction had become an accomplished fact, constituting a condition of the situation of the debtor company at the time such creditor gave credit.

15. RAILROAD COMPANIES—VALIDITY OF SECURITIES—OVERISSUES.

The provision in the Illinois constitution (article 11, § 13) that "no railroad corporation shall issue any stock or bonds except for money, labor or property actually received, and applied to the purposes for which such corporation was created; and all stock dividends, and other fictitious increase of the capital stock or indebtedness of any such corporation shall be void," does not invalidate stock or bonds merely because the value of what is received in exchange for them is not equal to their par value, provided the transaction is a real one, and not entered into merely to evade the law.

16. SAME.

Rev. St. Ohio, § 3290, regulating the rates and prices at which railroad corporations may sell their bonds and other securities, does not invalidate

· bonds received by a contractor for work done, unless it is clear that the cost of the work was palpably less than the statutory price of the bonds, so · that the parties knew it to be so when the contract was made.

This cause comes before this court upon several motions made by the Rhode Island National Bank, Jules S. Bache, and others, creditors of the Toledo, St. Louis & Kansas City Railroad Company, the purport of which can hardly be understood without a short statement of the course of the litigation:

On May 13, 1893, Stout and Purdy, citizens of New York, filed a creditors' bill against the defendant company (hereafter called the "Kansas City Company"), which was a consolidated corporation, organized under the laws of Illinois, Indiana, and Ohio. The complainants were judgment creditors, and filed their bill on behalf of themselves and all other creditors of the Kansas City Company. Similar bills were filed in Indiana and Illinois, and the same receiver was appointed to take charge of and operate the railroad in the three jurisdictions. The receiver took charge of the road and operated it. Various creditors of the company filed intervening petitions. Among them were the owners of bonds issued by the defendant, and secured by a mortgage upon the road given to the Continental Trust Company, of New York, and John M. Butler, of Indiana, trustees. These bondholders were permitted, on their petition, to become parties as a committee representing themselves and all others of their class. Subsequently, in December, 1893, the trustees under the mortgage filed in this court a bill to foreclose it against the Kansas City Company, as a citizen of the three states of Illinois, Indiana, and Ohio, and made parties defendant with the company Calloway, the receiver, a citizen of Ohio, and several judgment creditors of the Kansas City Company, citizens of New York and other states. The receiver was made a defendant by leave of court granted in the creditors' suit. The receiver was continued in charge under the foreclosure bill. At the same time an order was made consolidating the action under the creditors' bill and the action of foreclosure, and directing that the consolidated cause take the same title as the foreclosure suit. In the creditors' suit, intervening petitions were filed by creditors claiming liens on part of the · equipment prior in right to that of the mortgage bondholders. These petitions were answered by the trustees under the mortgage, and the issues thus made were referred to a master to take testimony. Answers were filed to the bill of foreclosure by the judgment creditors made defendants therein, and after replication the issues were referred to a master to take evidence, and the master has not yet reported. Intervening petitions have now been filed by the Signal Oil Works, the Rhode Island Locomotive Works, the Rhode Island National Bank, the Contracting & Building Company of Kentucky, Jules S. Bache, and Ferdinand E. Canda, as creditors of the Kansas City Company, and some of them by motions seek an order compelling the complainant trustees to answer the intervening petitions. The petitions of the Signal Oil Works and of Canda attack the validity of the mortgage bonds, (1) in that they were issued for an inadequate consideration, and in violation of the constitution of Illinois; and (2) on the ground that many of them were issued to directors of the company at less than par, and to others at less than 75 per cent. of par, in violation of the laws of Ohio rendering such bonds void. The other petitions, in addition to the foregoing, also attack the validity of the bonds and mortgage on the ground that they were issued by a pretended corporation purporting to be the result of a consolidation of three corporations, one of Illinois, one of Ohio, and one of Indiana, when there was no law authorizing such a corporation, and on this ground ask for relief of a peculiar character, more fully to be stated. Other motions have been filed by the petitioners as follows: (1) A motion to dismiss the foreclosure bill of the Continental Trust Company and John M. Butler, trustees, for want of jurisdiction, on the ground that the necessary diverse citizenship between complainants and defendants is shown on the face of the bill not to exist. (2) A motion to set aside the order granting leave to the complainant trustees to make Calloway, receiver, party defendant to the bill, and the decree pro confesso taken against him, on the ground that he was not a proper party to the action. (3) A motion to set aside the order consolidating the two causes.

(4) A motion to set aside the order appointing a special master to take and report the evidence, and to suppress the evidence already taken. (5) A motion for a decretal order in the creditors' suit, referring the same to the standing or a special master for proceedings in accordance with chancery practice in general creditors' bills, fixing a time in which all creditors may present their claims to the master, and a time when all parties in interest may file objections to the claims presented, and excluding from the benefit of the suit all creditors not presenting their claims to the master within the time fixed.

Cary & Whitridge and Henry Crawford for the Continental Trust Company.

Coudert Bros., J. D. Springer, and Squire, Sanders & Dempsey, for petitioners.

TAFT, Circuit Judge (after stating the facts as above). The motion to dismiss the foreclosure bill must be denied. It is conceded that the court had jurisdiction of the creditors' bill filed by Stout and Purdy, and that, at the time when the trustees under the mortgage filed their foreclosure bill, all the property of the railroad covered by the mortgage was in the possession of this court, by its receiver. The trustees could obtain no substantial relief by a foreclosure of the mortgage and a sale of the road in a state court, so long as this court had possession of it. To avoid injustice, this court was obliged, therefore, to exercise a jurisdiction ancillary in its nature, for the benefit of those otherwise injured by its possession of the property, and had power to entertain a foreclosure bill to which the parties complainant and defendant were not of such diverse citizenship as to give the court independent jurisdiction. The circuit court of appeals of this circuit has considered at length this kind of jurisdiction, and the basis upon which it rests, and the authorities sustaining it, in the case of Compton v. Railroad Co., 31 U. S. App. 486, 522, 529, 15 C. C. A. 397, 68 Fed. 263. The foreclosure bill stated the fact that the railroad, the mortgage on which it was filed to foreclose, was in the hands of this court. That was the jurisdictional fact, and made immaterial the circumstances that one complainant was a citizen of New York and the other of Indiana, and that among the defendants were citizens of Indiana and New York. It cannot be of importance that the bill was apparently filed as an independent bill. If in fact the only way of maintaining jurisdiction of it is as a dependent bill, ancillary to the creditors' action, it is the duty of the court so to treat it, provided it appear, as it does, that it can be maintained as such. But care must be taken not to give too much effect to the dependence of one suit on the other for jurisdictional purposes. Such dependence does not throw both suits into hotchpot, and dispense with the ordinary rules of pleading and practice as to parties proper and necessary to each cause of action. Because the res acquired under the original bill gives ancillary jurisdiction to entertain a dependent bill seeking relief in respect of the res, parties to the original bill are not thereby made parties to the dependent bill. The parties to the original bill have no more right to intervene in the dependent cause than if the court had independent jurisdiction thereof. Hence the rule as to who may appear to a foreclosure bill and file answers is the same here as if the bill had in fact been an

independent bill. In other words, the relation between the two suits is principal and ancillary only so far as that, without possession of the res in the former suit, the court would have no jurisdiction of the latter; but, having thus acquired and thus maintaining its jurisdiction in the second suit, the court proceeds in it without further regard to the pleading or course of the principal action. In this view of their relation to each other, there cannot be the slightest objection to consolidating the two suits, if they are otherwise of such a character as to permit it. I shall not stop to discuss the power of the court in this regard. It suffices to say that the duty of the court to consolidate causes, where no one will be injured thereby, is plainly suggested by the federal statute on the subject (Rev. St. § 921), and one of the commonest instances of the exercise of this power is in the consolidation of a creditors' bill and a foreclosure bill against the same insolvent railroad corporation. The motions to dismiss the foreclosure bill and to set aside the order of consolidation are denied.

The motion to set aside the order making the receiver a party to the foreclosure bill, and the decree pro confesso against him, is granted. He is not a proper party to such a proceeding, and the decree against him is idle.

I see no reason for suppressing the evidence taken on any of the issues already framed and sent to a master, nor is there any reason to set aside the orders of reference. The motions for this purpose are denied.

The motion for an order requiring the master in the creditors' suit to advertise the hearing of claims against the railroad company, and fixing the time of their presentation in his office, and the time for objections to the same, in accordance with the usual practice in a proceeding by general creditors' bill, is granted. The order ought to have been made at a much earlier time in the proceedings, but it is not too late now. Such a course is expressly approved by the supreme court of the United States in Trustees v. Beers, 2 Black, 457; In re Howard, 9 Wall. 175; Johnson v. Waters, 111 U. S. 674, 4 Sup. Ct. 619; Coal Co. v. McCreery, 141 U. S. 476, 12 Sup. Ct. 28. The proper course to be taken is described in 2 Daniell, Ch. Prac. (Eng. Ed. 1837–40) 854. This is the edition to which Mr. Justice Bradley refers in a note to his opinion in Thomson v. Wooster, 114 U. S. 104, 112, 5 Sup. Ct. 788, as the most authoritative work on English chancery practice when the equity rules were adopted by the supreme court, in 1842, and as exhibiting that "present practice of the high court of chancery in England," which by the ninetieth equity rule was adopted as the standard of equity practice in cases not covered by the special provisions of the equity rules.

We must now return to the principal motion urged by the petitioners, to wit, that the trustees be ordered to answer their petitions. The action was begun in 1893. The creditors' bill of Stout and Purdy expressly recognized the validity and priority of the bonds which are now attacked in the petitions under consideration. Three years have elapsed since these petitions might have been tendered. Even if it be granted that the concession in the bill does not prevent interveners from attacking the bonds and their origin, certainly it lies with the

court, after this long delay, and after what looks much like laches, now to determine how much of these petitions which were filed without leave may be regarded as making proper issues in the case for the bondholders to meet at this stage of the proceedings. The power of the court to supervise and restrict the matter of pleadings filed under such circumstances is well established. Ritchie v. McMullen, 25 C. C. A. 50, 79 Fed. 522, 529; Toler v. Railway Co., 67 Fed. 168, 175.

It is first said on behalf of the bondholders that the interveners should not be permitted to contest the validity of the bonds in this action, because since the consolidation the action on behalf of creditors has become so absorbed in the foreclosure bill that the latter action dominates the whole proceeding, and that, as in a foreclosure bill a general creditor could not contest the validity or amount of the mortgage lien, the same rule must prevail here. No such effect can be given to an order of consolidation. So to hold would be to construe the order into one dismissing the creditors' bill. Causes are consolidated only when they may proceed to judgment under one title without impeding or diminishing the remedial object and effect of the proceeding for each complainant. In a hearing on a creditors' bill, any creditor making himself a party by presenting a claim may be heard to contest the claim of every other creditor seeking payment out of the estate of the debtor. 2 Daniell, Ch. Prac. (6th Ed.) 1210, note 3; Shewen v. Vanderhorst, 1 Russ. & M. 347; Owens v. Dickenson, Craig & P. 48, 56; Woodgate v. Field, 2 Hare, 211, 213; Whitaker v. Wright, Id. 310, 314; Field v. Titmuss, 1 Sim. (N. S.) 218, 223; Graves v. Wright, 2 Dru. & War. 77, 79; Woodyard v. Polsley, 14 W. Va. 211. I can see no reason why any creditor intervening in this action under the creditors' bill may not attack the claim of any other creditor seeking the benefit of that bill. The bondholders have made themselves parties to the creditors' bill by a committee of their number, and have set up their claims and lien. Why may not another creditor attack their claims? It is said that every creditor is bound by the concession of the bill that the bonds and mortgage are valid. Why should this be so? Undoubtedly an intervening creditor may not defeat the judgment claim of the complainant, upon which the bill is founded and the court obtains jurisdiction. Fuller v. Redman, 26 Beav. 614; Briggs v. Wilson, 5 De Gex, M. & G. 12. But why should the collateral averments of the bill not necessary to the cause of action stated, or to the relief prayed in the bill, conclude the intervening creditors? I can see no reason, and I am not disposed to recognize or enforce unnecessary estoppels in procedure which would only increase the necessity for additional litigation. It must be held, therefore, that the petitioners may attack, under the creditors' bill, the validity and extent of the mortgage lien. And those creditors who have expressly conceded the validity and extent of the bonds may have leave to amend their petitions by striking out the concession.

Coming now to the matter of the petitions, the question is whether the issues the petitioners seek to make with the bondholders are sufficiently germane and important to justify the court, at this late day

in the litigation, in delaying the cause until they can be formally answered, heard, and decided.    Let us consider first the averment that the Toledo, St. Louis & Kansas City Railroad Company is neither a corporation de jure nor a corporation de facto.    Can such a defense be urged by one purporting to be a creditor of the pretended corporation?    If the bonds are null and void because the corporation issuing them was a nullity, clearly the debts of the petitioners and the complainant are in no better condition, and the court has nothing upon which to exercise its jurisdiction.    Anticipating this dilemma, the petitioners allege that the money they seek to recover was advanced by them to one Kneeland, the contractor who widened the gauge of the railroad, on his false representation that the extended corporation was a real corporation of Illinois, Indiana, and Ohio, the result of a lawful consolidation of three constituent corporations, one of Illinois, one of Indiana, and one of Ohio; that, by reason of his construction of the road, he has equitable claims against the three constituent corporations, and that, because of his insolvency, the petitioners, his creditors, are entitled in this action to subject such equities of Kneeland to the payment of his debts to them; and that, though these debts also purport to be debts of the pretended consolidated corporation, they are not obliged to rely on any such obligation, and may, without weakening their own position in the cause, show the nonexistence of the pretended consolidated corporation, in order to render null and void its pretended bonds. If this cause were a creditors' bill against the three constituent corporations, it is possible that this somewhat awkward method of escaping suicide might be successful, but the difficulty is that the only ground upon which interveners may invoke the action of this court is the sufficiency of the creditors' bill by which this cause was begun.    They have no standing in court at all to take part in the distribution of the assets of the defendant debtor, save as they accept the tender of the benefit made to them by the complainant in his bill. If they would be independent of this restriction, they are at liberty to put their claims in judgment, and, after a nulla bona return, to file a creditors' bill of their own against any defendants they may select, and under it they may dispute all other claims.    But, so long as they owe their right to be in court at all to the sufficiency of the averments of the bill for the relief asked, they cannot be heard to question the very basis upon which alone the court can act.    If it is true that the defendant in the bill is not an entity at all, but only an empty name and nullity, the bill must fail for want of a defendant, and with it must fall all the petitions herein.    We have seen at another part of this discussion that, according to the chancery practice under such bills, a creditor intervening will not be permitted to urge the statute of limitations against the complainant's claim, for the reason that, if that claim is utterly defeated, the whole proceeding must fail for want of jurisdiction in the court to grant any relief under the bill.    Fuller v. Redman, 26 Beav. 614; Briggs v. Wilson, 5 De Gex, M. & G. 12; 2 Daniell, Ch. Prac. 1211.    In the light of this rule of practice, it seems hardly necessary to point out that a defense urged by one creditor against the claim of another, which

must defeat, not only that at which it is aimed, but also that of the complainant and all other claims, and which denies the existence of the defendant against whom the action was brought, cannot be permitted to an intervener. But, aside from the difficulty it meets in the chancery practice, the defense has no merit in it. It is conceded that all the petitioners have dealt with the company as a corporation, and that they hold claims against it contracted with it as a real corporate entity. "It is too well settled to need discussion that both a de facto corporation and the persons exercising the rights of stockholders in such a corporation are estopped to assert its unauthorized existence as a corporation to avoid a debt incurred in the actual exercise of corporate franchises and the doing of corporate business." Farmers' Loan & Trust Co. v. Toledo, A. A. & N. M. Ry. Co., 67 Fed. 49, 55, and cases cited. Certainly, if a pretended corporation is estopped to make a defense of this character against bondholders, its subsequent creditors, who must derive their right to make a defense at all through the debtor corporation, are equally estopped.

A distinction between this case and those authorities in which the foregoing rule is recognized is pressed upon the court. It is said that the principle that the acts of a de facto corporation can never be assailed collaterally has no application where the law makes no provision for a de jure corporation of the kind which the one in question here purports to be, and that, as there was no law of Illinois or Ohio authorizing the consolidation of the three corporations which it was attempted here to consolidate, there could be no de jure corporation, and so no de facto corporation. The case of American Loan & Trust Co. v. Minnesota & N. W. R. Co., 157 Ill. 641, 42 N. E. 153, is cited and relied on to support the argument. In that case it was held that the attempted consolidation of an Illinois corporation with one of another state at a time when there was no general law in force permitting the consolidation of an Illinois corporation with that of another state was void, and that the force and validity of attempted action by the pretended consolidated corporation must be denied, even when collaterally attacked. It is certainly true that the rule of public policy which validates, for all purposes save that of direct inquiry by the sovereign, acts of those who, without lawful authority, assume an official or corporate character, and actually exercise official or corporate functions, must have the limitation that the character assumed and functions exercised are those which it is the declared purpose of the sovereign to have some one lawfully assume and discharge. The limitation is declared and fully explained in the case of Norton v. Shelby Co., 118 U. S. 425, 6 Sup. Ct. 1121. In that case it was sought to hold a county of Tennessee liable for bonds issued by persons purporting to be a board of county commissioners. The supreme court of the state had held the act creating the board void, and that the board was a body not known to the constitution of the state, and was an anomaly in its system of administering county affairs. It was sought to make the county liable on the ground that the board was a de facto board. It was held by the supreme court of the United States that the pretended commissioners could not be de facto incumbents of an office which could not exist, and that

the idea of an officer implies the existence of an office which he holds. It is to be observed, however (and this distinction seems to have escaped the attention of learned counsel for petitioners), that the validity of the acts of a de facto officer or corporation in a collateral proceeding is not affected by the circumstances that the particular persons or constituents assuming and discharging the official or corporate functions could not by any steps have acquired the requisite legal qualifications for lawfully exercising such functions. They may be completely ineligible, and yet, if they are allowed to discharge the duties and exercise the powers of an office or a corporation which the law recognizes as in existence or capable of lawful existence, their acts as such cannot be impeached as invalid in a collateral proceeding. In Ashley v. Board of Sup'rs, 16 U. S. App. 656, 668, 8 C. C. A. 455, 60 Fed. 55, a case decided by the circuit court of appeals for this circuit, the action was on certain bonds issued by the county of Presque Isle, in the state of Michigan. In that state, by constitutional restriction, no county could be organized until more than one township had been organized in the proposed county territory. The county of Presque Isle had been organized under an act of the legislature when it had within its borders only one township. This was offered as a defense to the suit upon the bonds issued by the acting authorities of the pretended county, but the circuit court of appeals, in an extended opinion by Judge Severens, held that, because a county was a public corporation of a kind recognized by the organic law of the state, the persons assuming to act and exercise powers as the county of Presque Isle, without direct interference by the state, would be treated as a de facto corporation, and would be held liable upon their bonds issued as such. The whole question of who are de facto officers was elaborately examined in the case of State v. Carroll, 38 Conn. 449, and a definition given to cover all cases. For the purposes of this case, it suffices to quote from the definition the following:

"An officer de facto is one whose acts, though not those of a lawful officer, the law, upon principles of policy and justice, will hold valid, so far as they involve the interests of the public and third persons, where the duties of the office were exercised—First, * * *: second, * * *; third, under color of a known election or appointment, void because the officer was not eligible, or because there was a want of power in the electing or appointing board, or by reason of some defect or irregularity in its exercise, such ineligibility, want of power, or defect being unknown to the public; fourth, * * *."

This language is quoted with approval in Norton v. Shelby Co., 118 U. S. 425, 6 Sup. Ct. 1121. See, also, Blackburn v. State, 3 Head, 690. It is true that the authorities just quoted related to officers de facto, and not to corporations de facto, but the cases are quite analogous; and it may be safely stated as the rule that when persons assume to act as a body, and are permitted by acquiescence of the public and the state to act, as if they were legally a particular kind of corporation, for the organization, existence, and continuance of which there is express recognition by general law, such body of persons is a corporation de facto, although the particular persons thus exercising the franchise of being a corporation may have been ineligible and incapacitated by the law to do so.

In the light of this statement of the law, the averments of the petitions are quite insufficient to show that the Toledo, St. Louis & Kansas City Railroad Company was not at least a de facto corporation. It is not denied that under the general laws of Illinois, Ohio, and Indiana a corporation may be organized by consolidation which shall be a corporation of each of the three states. Indeed, the petitions themselves refer to a corporation known as the Toledo, Cincinnati & St. Louis Company, a former owner of the railroad here in controversy, as a lawfully consolidated corporation of Illinois, Indiana, and Ohio. If there could be a de jure consolidated corporation of the three states, as there undoubtedly could be, then the Kansas City corporation, in exercising the functions of such a consolidated corporation, was a de facto corporation of the three states.

The averments of the petitioners and their arguments in this behalf ought, perhaps, to be stated a little more in detail. They allege that when the property of the Toledo, Cincinnati & St. Louis Railroad was about to be sold in foreclosure under two mortgages, the one covering what was known as the "St. Louis Division," and the other the "Toledo Division," the bondholders under each mortgage made a contract with one Kneeland by which he agreed to buy in for them at the judicial sale the two divisions of the road; to organize three corporations, one in Illinois, one in Indiana, and one in Ohio: to convey to each the part of the road lying in the state of its origin in exchange for all its shares of capital stock; and then to bring about the consolidation of the three corporations as a consolidated corporation of the three states. Part of the line of railroads operated by the Toledo, Cincinnati & St. Louis Railroad Company was 67 miles in length, running from the state line between Indiana and Illinois to Frankfort, Ind., owned and built by the Frankfort & State Line Railroad Company, a corporation of Indiana. The petitions aver that a contract of sale was made by which all the stock of this company became the property of the Toledo, Cincinnati & St. Louis Company, and its road was turned over to the latter company as its property, and was operated by it as part of its line; that much of the line was built by money borrowed by the St. Louis Company on mortgage security; and that formal consolidation proceedings merging the Frankfort Company in the St. Louis Company were not had for fear that such a merger or consolidation might forfeit certain legal aids and municipal subscriptions. At the time of the consolidation by Kneeland, in 1886, there was a statute of the state of Illinois permitting consolidation of railway corporations with those of other states, passed in 1883, which provided as follows:

"Whenever any railroad which is situated partly in this state, and partly in one or more other states, and heretofore owned by a corporation formed by consolidation of railroad corporations of this and other states, has been sold pursuant to the decree of any court or courts of competent jurisdiction, and the same has been purchased as an entirety and is now or hereafter may be held in the name or as the property of two or more corporations incorporated respectively under the laws of two or more of the states in which said railroad is situated, it shall be lawful for the corporation so created in this state to consolidate its property, franchises and capital stock with the property, franchises and capital stock of the corporation or corporations of such other state

or states in which the remainder of such railroad is situated and upon such terms as may be agreed upon between the directors, and approved by the stockholders owning not less than two-thirds in amount of the capital stock of such corporations." 3 Starr & C. Ann. St. (2d Ed.) p. 3241, par. 33.

The counsel of the petitioners contend that this statute did not authorize the consolidation here—First, because the line of railroad from St. Louis to Toledo was not, prior to the judicial sale, owned by a consolidated corporation of Illinois and other states, for there were 67 miles of the line from the Illinois and Indiana state line to Frankfort owned by a distinct corporation, to wit, the Frankfort & State Line Railroad Company; and, second, that the road was not "purchased as an entirety," because, though the whole road was bought in by Kneeland at the same time, the sales of the two divisions were separate, being covered by separate mortgages. With deference, it seems to me that this is too refined. The averments of the petitions clearly show that in equity the St. Louis Company owned the 67 miles of road between the state line and Frankfort, both by owning all the capital stock of the Frankfort Company, and by having built the road with money raised by its own bonds, and that it was in fact a part of the through line from St. Louis to Toledo. The same petitions also show that the chief purpose of the preliminary contracts between the bondholders under the two mortgages and Kneeland was to bring about the purchase of the whole line as an entirety. I cannot doubt that if the question were raised in a direct proceeding, and the averments of the petition were proven, it would be held that the consolidation here shown was within the letter and the spirit of the act of 1883 of Illinois. But, even if it were not, there was in force another law of Illinois at the time of the consolidation which fully authorized it. An act approved June 30, 1885 (3 Starr & C. Ann. St. [2d Ed.] p. 3243, par. 36), provided:

"That all railroad companies now organized, or hereafter to be organized under the laws of this state, which now are or hereafter may be, in possession of and operating in connection with or extension of their own railway lines any other railroad or railroads in this state, or in any other state or states, or owning and operating a railroad which connects at the boundary line of this state with a railroad in another state, are hereby authorized and empowered to purchase and hold in fee simple or otherwise and to use and enjoy, the railway property, corporate rights and franchises of the company or companies owning such other road or roads upon such terms and conditions as may be agreed upon between the directors and approved by the stockholders," etc.

Although this act uses the word "purchase," it plainly contemplates consolidation, and this is the holding in Illinois. Railway Co. v. Ashling, 56 Ill. App. 327. Now, it is quite manifest that after Kneeland's purchase and conveyance of the road, in three parts, to the three separate corporations, the Illinois corporation owned and was operating a line in connection with a line of railroad extending into Indiana and into Ohio, which was owned partly by an Indiana and partly by an Ohio corporation, and that under this statute the Illinois corporation was authorized to acquire the whole line on terms and conditions which might include consolidation. And even if I am wrong in my construction of these two laws, and it is true that the consolidation here under discussion was defective, nevertheless these

laws plainly show that a consolidated corporation of Illinois, Indiana, and Ohio, authorized to operate a line of railroad through the three states, was a possible legal entity recognized by Illinois statutes. Therefore any body of persons assuming to act and permitted to act as such a corporation would be a corporation de facto, according to the principles above stated.

It is also objected that the consolidation under the Ohio statute was a nullity. Section 3380 of the Revised Statutes of Ohio, in force at the time of the consolidation of this case, provided that:

"A company organized in this state for the purpose of constructing, owning and operating a line of railway or whose line of road is made or is in process of construction to the boundary line of this state or to any point either in or out of the state may consolidate its capital stock with the capital stock of any company in an adjoining state organized for a like purpose and whose line of road has been projected, constructed or is in process of construction to the same point where the several roads so united and constructed will form a continuous line for the passage of cars."

It is contended that although the Ohio corporation organized by Kneeland might, under this statute, have been consolidated with the Indiana corporation organized by the same person, it does not permit an Ohio corporation to be consolidated with an Indiana and an Illinois corporation, because Illinois does not adjoin Ohio. It cannot be denied, however, that under the Illinois statute the Illinois and Indiana corporations might have united, and that then the consolidated corporation, being a corporation of Indiana, could be consolidated with the Ohio corporation; and we should have had just what the corporation under consideration purports to be, to wit, a legally consolidated corporation of Ohio, Indiana, and Illinois. It is obvious that, if such a corporation could have been legally formed, the mere mistake in the mode by which the union was brought about (if it was a mistake, which I do not decide) does not prevent the corporation from being a de facto corporation, under the principles stated at length above. In so far, then, as the petitions base any defense against the bonds and mortgage on defects in the corporate origin of the consolidated company, they do not need an answer from the bondholders, and to this extent the motion is denied.

We come now to the alleged irregularity, illegality, and fraud set up in these petitions. The Toledo, Cincinnati & St. Louis Railroad Company, a consolidated corporation of Illinois, Indiana, and Ohio, in 1882 owned and operated a narrow-gauge railroad, 450 miles in length, from St. Louis to Toledo. The mortgage indebtedness of the company aggregated $9,500,000, of which about $5,000,000 were first mortgage bonds, and the remainder were income bonds. The company had also issued $2,000,000 of preferred stock and $19,000,000 common stock. The two separate mortgages on the Toledo and the St. Louis Divisions were foreclosed, and the two divisions were sold, in December, 1885. The road was bought by S. H. Kneeland for the first mortgage bondholders of the two divisions. The sale was subject to the lien of an indebtedness of about $1,200,000. A new consolidated corporation was formed by Kneeland, and it issued bonds secured by mortgage on the entire road amounting to $9,000,000, preferred stock

amounting to $5,805,000, and common stock amounting to $12,250,000, and deposited all the securities with trustees. The purchase of the road, the organization of the new corporation, and the issue of the bonds and stock were in accordance with an agreement made between Kneeland and the bondholders under the two mortgages which were being foreclosed. In effect, the agreement provided that Kneeland should buy the road, making the down payment, and using the old mortgage bonds to complete the purchase price; that he should reconstruct the road, renew its equipment, and widen its gauge; that he should pay the claims against the road, subject to which it was bought, should pay all attorney's fees and expenses not included in, and provided for in, the final decree in the foreclosure suit; and that he should pay the interest on the bonds to be issued pending the reconstruction. As compensation, he was to receive bonds at the rate of $20,000 and common stock at the rate of $25,000 per mile of reconstruction, to be delivered by the trustees as the work progressed, according to its value, on certificates of the company's engineers. Kneeland was to receive in advance $2,000,000 of the bonds and $2,500,000 of the stock. He was also to be given so much of $1,000,000 of preferred stock as he paid off of the prior lien claims against the road. $4,805,000, par value (i. e. the remainder), of the preferred stock, was to be distributed by the trustees to the holders of the bonds secured by the foreclosed mortgages. Ten shares of stock were to be exchanged for one bond under the St. Louis Division mortgage, and ten shares for one bond and one-half under the Toledo Division mortgage. By another and secret agreement, Kneeland stipulated that the holder of ten shares of the preferred stock might, by paying $1,000, receive one mortgage bond and ten shares of common stock. It also appears that each member of the committees of bondholders received seven bonds as compensation for his services. It also appears that each member of the committee who chose to do so was given the privilege, after a certain time, of purchasing the preferred stock not exchanged for the old mortgage bonds by paying a certain portion of the purchase price of the road at judicial sale, but it is not averred how much stock was taken under this privilege. Kneeland proceeded with the reconstruction, and received all the bonds and stock to which he was entitled under the contract. Of these bonds and shares of common stock, he sold to the old bondholders under the above privilege bonds to the par value of $1,382,000, and common stock of the same par value, for the cash price of $1,382,000. Kneeland paid off all but $500,000 of the prior lien debts on the road. It is averred that Kneeland did not expend more than $6,000,000 in the reconstruction of the road; that he did not do the work as it should have been done; that, by reason of his ownership of the common stock, he was able to control the board of directors, and secure the appointment of his creatures as the company's engineers, whose reports of work done were fraudulent; that he had as a secret partner in his contract, one Quigley, the chairman of the two bondholders' committees, and the president and a director of the company; and that the deliberate intention of the contractors was to make an inordinate profit, by a corrupt failure to do the work of construction as provided in the contract. An examination of the evidence

already taken on some of the issues made in the case shows a controversy between the company and Kneeland over the manner in which the work had been done, and other stipulations of the contract had been performed, and one or two contracts of settlement made between him and the trustees, against which others in interest protested. As has already been stated, the debts against the company held by these petitioners were all contracted several years after the work of reconstruction was concluded, and long after the formation and execution of the plan of reorganizing the old company into the new. Upon these facts and averments the petitioners contend: First. That the mortgage bonds are void because the contract of January 23, 1886, made between the old bondholders, on behalf of the company to be formed, and Kneeland, the contractor, was conceived in fraud, and was brought about by the secret interest which Quigley, the chairman of the committee of the old bondholders, and subsequent president of the company, was given by Kneeland in the profits of the contract; and because there was fraud in the execution of the contract, in that Kneeland, through his ownership of common stock, controlled the officers of the road and the engineers who supervised the performance of his stipulations. Second. That the bonds are void because of the violation of the thirteenth section of the eleventh article of the constitution of Illinois. Third. That they are void because they are issued at a price less than 75 cents on the dollar of par value, in violation of the laws of Ohio. Fourth. That in any event many of the bonds are void because issued to the directors of the company at a price less than par, which, by the laws of Ohio, renders them void.

1. It is said that these bonds were issued in pursuance of a corrupt and fraudulent agreement, and that they are, therefore, not valid obligations of the company. At the time the contract of January 23, 1886, was made, the petitioners had no relation whatever to the company or its incorporators. The debts of petitioners were none of them contracted until 1892 and 1893. The real parties to the contract of January, 1886, were the bondholders under the old mortgages, the then owners of the road, and Kneeland, who proposed to rebuild and improve it. By the incorporation of the company the real parties to the contract did not change,—so far, at least, as to the interests actually conflicting. The contractor became, by the plan of reorganization and the rebuilding, the owner of much of the common stock and of the bonds, while the preferred stockholders continued to be those for whom the work was being done, and whose interests would be prejudicially affected by fraud either in the inception of the contract or in its execution. The contract was made in 1886, and was executed, so far as it was executed, in 1890. Disputes arose between Kneeland and the company which resulted in agreements of settlement before the debts of petitioners were contracted. Now, it may be that these settlements can be set aside by the company for fraud. It may be that the contract itself can be impeached for fraud by the company or some of its stockholders. But it is very certain that until the company, or some one interested in it as a stockholder, shall take the proper steps to secure such relief, it is not in the power of creditors, who became such after the transaction with respect to which fraud is charged was an ac-

complished fact, and was a condition of the situation of the debtor company when they gave it credit, to impeach the obligations arising out of the transactions. This is a well-settled principle of equity jurisprudence, affirmed by the supreme court of the United States in Graham v. Railroad Co., 102 U. S. 148, and in Porter v. Steel Co., 120 U. S. 673, 7 Sup. Ct. 1206. In the latter case the court announces it as "a well-settled principle that subsequent creditors cannot be heard to impeach an executed contract, where their dealings with the company of which they claim the benefit, occurred after contract became an executed contract." It follows that in the case at bar the averments of the petitions as to the fraud which entered into the inception or execution of the Kneeland contract do not properly raise issues which the bondholders can be compelled to meet, even in the creditors' suit. I do not mean by this to express an opinion upon the right of the corporation itself, or of the preferred stockholders in its name, to raise such an issue against the bondholders.

2. It remains only to inquire whether there are any provisions of positive constitutional or statutory law to which petitioners can appeal as having the effect of absolutely nullifying the bonds here in question on grounds of public policy. Section 13, art. 11, of the constitution of Illinois, provides as follows:

"No railroad corporation shall issue any stock or bonds, except for money, labor or property actually received, and applied to the purposes for which such corporation was created; and all stock dividends, and other fictitious increase of the capital stock or indebtedness of any such corporation, shall be void."

This section, it is contended, renders void all the issues of bonds and stock under the plan of reorganization, because they were, in effect, a fictitious increase of stock and indebtedness. An article exactly like this in the constitution of Arkansas has been construed by the supreme court of the United States, in the case of Railroad Co. v. Dow, 120 U. S. 287, 7 Sup. Ct. 482. In that case the bondholders under two mortgages securing a total debt of about $4,000,000 foreclosed the mortgages and bought the road. A new company was organized, which issued to the bondholders $1,300,000 of paid stock and $2,600,000 of new bonds in exchange for the road. It was admitted that the actual value of the road did not exceed $1,300,000, and the contention was that, as the stock to that amount had first been issued, the subsequent issue of bonds was fictitious, and was void, under the article in question. To this the supreme court, speaking by Mr. Justice Harlan, replied as follows:

"We do not concur in this view of the case. It does not, we think, rest upon a sound interpretation of the state constitution. The prohibition against the issuing of stock or bonds, except for money or property actually received, or labor done, and against the fictitious increase of stock or indebtedness, was intended to protect stockholders against spoliation, and to guard the public against securities that were absolutely worthless. One of the mischiefs sought to be remedied is the flooding of the market with stock and bonds that do not represent anything whatever of substantial value. In reference to a provision in the constitution of Illinois, adopted in 1870, containing a prohibition, as to railroad corporations, similar to that imposed by the Arkansas constitution upon all private corporations, the supreme court of the former state, in Railroad Co. v. Thompson, 103 Ill. 187, 201, said: 'The latter part of the clause of the constitution in question, which declares that "all stocks, dividends, and

other fictitious increase of the capital stock or indebtedness of such corporation shall be void," we think, clearly points out the chief object which the constitutional convention sought to accomplish in adopting it; and to this we must look, in a large degree, for a solution of the language which precedes it. The object was doubtless to prevent reckless and unscrupulous speculators, under the guise or pretense of building a railroad, or of accomplishing some other legitimate corporate purpose, from fraudulently issuing and putting upon the market bonds or stocks that do not, and are not intended to, represent money or property of any kind, either in possession or expectancy, the stock or bonds in such case being entirely fictitious. * * * Under this provision of the constitution, railroad companies have no right to lend, give away, or sell on credit their bonds or stock, nor have they the right to dispose of either except for a present consideration and for a corporate purpose.' Recurring to the language employed in the Arkansas constitution, we are of opinion it does not necessarily indicate a purpose to make the validity of every issue of stock or bonds by a private corporation depend upon the inquiry whether the money, property, or labor actually received therefor was of equal value in the market with the stock or bonds so issued. It is not clear, from the words used, that the framers of that instrument intended to restrict private corporations—at least, when acting with the approval of their stockholders—in the exchange of their stock or bonds for money, property, or labor, upon such terms as they deem proper, provided, always, the transaction is a real one, based upon a present consideration, and having reference to legitimate corporate purposes, and is not a mere device to evade the law and accomplish that which is forbidden. We cannot suppose that the scheme whereby the appellant acquired the property, rights, and privileges in question, for a given amount of its stock and bonds, falls within the prohibition of the state constitution. The beneficial owners of such interests had the right to fix the terms upon which they would surrender those interests to the corporation of which they were to be the sole stockholders. And, that subsequent holders of stock might not be misled, each certificate of stock states upon its face that the holder takes this stock subject to $2,850,000 of mortgage bonds of the company, which are secured by two mortgages duly recorded. All that was done was to reorganize the Little Rock & Memphis Railroad Company upon the same basis, substantially, as to capital stock and bonded indebtedness, as existed, in respect to these properties, rights, and privileges, before the adoption of the state constitution, and while they were held and controlled by the companies which preceded the appellant in the ownership. There was consequently no fictitious increase by appellant of its stock or indebtedness. Under these circumstances, it cannot be fairly said that the bonds secured by the mortgage were issued without any consideration whatever actually received in property."

I do not think the case at bar can be distinguished from that considered in the opinion cited. The Toledo, Cincinnati & St. Louis Railroad Company had a mortgage indebtedness of nearly $10,000,000, and capital stock of $21,000,000, and the reorganized company called the Toledo, St. Louis & Kansas City Railroad Company, by this plan, had a mortgage indebtedness of $9,000,000 and a capital stock of about $18,000,000, and, by the plan, added to the actual value of the road in cash not less than $6,000,000, and probably more. This would seem to have been a scaling down of the new company's securities about one-third below those issued by the old company, in proportion to the actual value represented by them. But it is said the case here differs from the Dow Case, in that here all the bonds and a large part of the stock were issued to a stranger, whereas in the Dow Case it was merely a distribution of securities among the former owners of the same road. If the stranger received the bonds and stock as a gift, merely, that might make a difference; but where, as here, in exchange for the bonds and stock he actually rebuilt the road, it seems to me to

make the present a much stronger case for refusing to apply the article of the constitution than the Dow Case. The bonds and stock were issued to Kneeland "for money, labor and property actually received and applied to the purposes for which such corporation was created." And the Dow Case expressly holds that the mere fact that that which is received is not equal in value to the par value of the stock and bonds issued in exchange for it does not invalidate the stock and bonds, provided the transaction is a real one, and not one entered into merely to evade the law. The petitioners here are concerned only with the bonds. The stock does not interfere with the collection of their debts. Now, certainly, the bonds are not within the mischief which the article was adopted to remedy; for they do represent substantial value, and the public, in purchasing the bonds, were not misled into paying value for securities which were worthless. The bonds are practically a first lien on property which was bonded with a first mortgage of at least $9,000,000, and to which at least $6,000,000 in improvements was added. The suggestion that the property was worth $9,000,000 before the sale will not meet the concurrence of the petitioners, who rely on the price bid to show much less value. It is true that the upset price of the property at the judicial sale before reorganization was but $1,500,000, and that the price actually bid exceeded this very little; but I venture to think that no one who has any experience in railroad foreclosures would regard the price bid by a committee of bondholders, with bonds in their possession enabling them to bid double the amount without the additional outlay of one dollar, as evidence having any weight as to the money value of the property purchased. It may be conceded that the common stock of the new company had little actual value except that incident to the control of the company's policy; and if, when it was issued, or shortly thereafter, any one interested in the road, or the state, had sought to have it declared void, it is possible that another question might have been presented than the one under discussion. But I am very clear that subsequent creditors cannot now avoid bonds, representing real value, issued to a contractor for money, services, and property actually delivered to the company, because, in addition to such bonds, the contractor at the same time received common stock, which, by reason of the amount of prior securities made a lien on the road, represented very little of real value. The petitions, so far as they are based on the thirteenth paragraph of the eleventh article of the constitution of Illinois, do not require any answer from the mortgage bondholders or their trustees, and to this extent the motion is denied.

3. It is contended that the bonds are invalid under section 3290 of the Revised Statutes of Ohio, relating to railway corporations, which provides as follows:

"The directors of the company may sell, negotiate, mortgage or pledge such bonds or notes as well as any notes, bonds, scrip or certificates for the payment of money or property which the company may have theretofore received, and shall hereafter receive, as donations, or in payment of subscriptions to the capital stock or for other dues of the company, at such times and in such places, either within or without the state, and at such rates and for such prices at not less than seventy-five cents on the dollar, as in the opinion of the directors will best advance the interests of the company; and if such notes

or bonds are thus sold at a discount, without fraud, the sale shall be as valid in every respect, and the securities as binding for the respective amounts thereof, as if they were sold at their par value."

The argument is that Kneeland received $9,000,000 of bonds and $12,000,000 of stock for an outlay of only $6,000,000, and that he therefore paid for the bonds only two-sevenths of their par value, and that the old mortgage bondholders, the present preferred stockholders, who exercised the privilege of taking one bond and ten shares of common stock for $1,000, paid only one-half of the par value for the bonds which they bought, to the amount, in the aggregate, of $1,382,000; that, as in both instances the purchasers paid less than 75 per cent. of the par value of the bonds, the transaction was in violation of the charter power of the corporation, and the bonds are void. There is nothing in the claim. Kneeland's contract was to do certain work for $9,000,-000 of bonds and $12,000,000 of common stock. There was no stipulation as to how much money he should expend in doing the work, and there is nothing to show that those with whom he contracted expected him to spend only $6,000,000. He had a right to make a profit on the transaction if he could, and the mere averment as to what he actually expended can have little or no bearing upon the question whether the contract was, to the knowledge of the parties making it, and at the time of making it, a sale of the bonds at less than 75 cents on the dollar, and a violation of the section. The mere fact, as alleged, that he failed to fulfill his contract, would sufficiently explain the failure to expend more money than $6,000,000. It must certainly appear, before such a contract as that with Kneeland can be said to be a violation of the section above quoted, that the cost of reconstruction which he agreed to do was palpably less than 75 per cent. of the par value of the bonds and the actual value of the stock, so that the parties to the contract knew it to be so when made. There are no averments of this kind in the petitions. The preferred stockholders gave $1,000 for a bond and ten shares of stock. Until it is averred or made to appear that the stock was worth more than 25 per cent. of par, it may be inferred that, of the amount paid, at least 75 per cent. of it was paid for the bonds, and the remainder only for the stock. The petitioners make no averment as to the actual value of the stock, and their petitions, therefore, fail to make a case under the statute relied on.

4. It is averred by the petitioners that certain of the bondholders acquired the bonds while they were directors of the company by the purchase from the company at a price less than par. Section 3313 of the Revised Statutes of Ohio provides that "all capital stock, bonds, notes, or other securities of a company, purchased of a company by a director thereof, either directly or indirectly, for less than the par value thereof, shall be null and void." The petitioners seek to apply this section first to certain bonds held by one Quigley, who was the chairman of the two committees of old bondholders who made the contract of January 23, 1886, with Kneeland. It is charged in the petitions that Quigley was jointly interested with Kneeland in the contract of January 23, 1886, as a secret partner, that Kneeland and Quigley quarreled after the contract had been partially executed, and that Quigley retired after receiving several hundred bonds. It

is averred that as, by the contract, the services and work to be done by Kneeland and Quigley were not equal to the par value of the stock and bonds to be delivered to Kneeland as compensation, the bonds which Quigley obtained from the transaction are within the section above quoted. The petition expressly avers that Quigley's connection with the contract as a partner of Kneeland was secret, and it is therefore to be inferred that the others, who represented the corporation to be formed, and who acted for the corporation after it was formed, did not know that in making the contract they were dealing with one of their own directors. It would certainly be an unreasonable construction of this statute to hold that, because Quigley was secretly interested in the contract for the issuing of the bonds, that invalidated all the bonds issued by reason of the contract, and coming into the hands of those who were not advised that Quigley had any connection with them. The attack, therefore, upon the bonds, growing out of the connection that Quigley had in the matter, could only affect those which were received by him when he settled with Kneeland. I think, however, without deciding any question involved in the issue, that I ought to allow the present petitioners to raise the issue whether the bonds which Quigley acquired (as averred in the petition) from Kneeland by virtue of this secret partnership were not obtained by him indirectly from the company for less than par. If they were, the question would still remain whether section 3313 avoids them in Quigley's hands, so that their invalidity can be availed of by subsequent creditors. I must reach the same conclusion with reference to the averments as to the application of section 3313 to the case of those bondholders who received bonds, while they were directors of the company, from Kneeland, at the price of $1,000 for a $1,000 bond and ten shares of the common stock. In the absence of proof, I suppose it must be assumed that the common stock is worth something, because it would hardly be offered as an inducement if it did not have some value. If it did have any value, then it would seem that the bonds, under such a contract, must have been sold at less than their par value. If the purchase from Kneeland of these bonds was a purchase from him, and not from the company, of course, the transaction would not be within section 3313, because that section only applies to purchases, direct or indirect, from the company. The petitioners, however, aver that, while the purchases seemed to be from Kneeland, they were the result of an option secured by the old bondholders from Kneeland at the time of the contract of January 23, 1886, and therefore were a part of that contract. Their contention is that any acceptance by directors of the company thereafter affirming the option thus secured would, in effect, be a purchase from the company, because it would be a privilege secured by the company to the old bondholders with reference to the sale of the stock to Kneeland. I do not intend to decide the question thus raised. I think it sufficiently serious to require that the issue should be regularly framed to raise it, that evidence should be taken, and that the question should be fully discussed. The intervening petitioners will be given leave to file new petitions which shall raise the question as to the part of the bonds, if any, purchased directly

or indirectly by the directors of the company from it, and held by them, or by persons acquiring the bonds from such directors. Whether bona fide purchasers of such bonds, who had no knowledge of their origin, would be exempted from the effect of the statute is a question the decision of which may be postponed till a regular hearing of the petitions.

The last averment in some of the intervening petitions which remains to be considered is that which charges that the receiver is in possession of a large amount of property, the title to which is in Sylvester H. Kneeland. The intervening petitioners aver that they are the holders and owners of notes made by the company to S. H. Kneeland, and by him indorsed to them; that Kneeland is wholly insolvent; and that they, as creditors of Kneeland, are entitled to subject the property of Kneeland held by the company, and subsequently by the receiver, to the payment of the indebtedness of these written obligations. I do not think that the petitioners are in a condition to raise any such question. They do not aver that they have taken judgment against Kneeland, or that they have issued execution on judgments against him, and have had them returned nulla bona. They have, therefore, no equitable interest, which they can assert in a federal court, in Kneeland's assets. They have not filed a creditors' bill against Kneeland, and they are not entitled to make this action such a proceeding by intervening petition. It is true that if they had acquired a judgment against Kneeland, and then had levied execution, they, pro interesse suo, might then come to this court, as a court of equity having possession of Kneeland's assets, and ask that the assets be subjected to the payment of their debts. But they cannot, in the absence of a suit against Kneeland to establish their claims, intervene in this suit, which is a creditors' suit, not against Kneeland, but against the railroad company, to assert an interest in Kneeland's assets held by the company and its successor, the receiver. If the receiver has any property which belongs to Kneeland, Kneeland himself may intervene and assert his interest in the same; but certainly his general creditors cannot until they have reduced their claims to judgment, and brought a proceeding in the nature of a creditors' bill. This principle is so clearly settled in the federal equitable jurisprudence that it is sufficient to cite, as conclusive upon the point, Scott v. Neely, 140 U. S. 106, 11 Sup. Ct. 712; Cates v. Allen, 149 U. S. 451, 13 Sup. Ct. 883, 977; Wehrman v. Conklin, 155 U. S. 314, 15 Sup. Ct. 129; Whitehead v. Shattuck, 138 U. S. 146, 11 Sup. Ct. 276.

These intervening petitions were filed without leave. The order of the court will be that they are stricken from the files, with leave to the petitioners to file intervening petitions against individual bondholders under the first mortgage issued by the Toledo, St. Louis & Kansas City Railway Company, against whom they can aver that the bonds held by them were purchased from the company by a director of the company at less than the par value, and that they are now held by such director, or by persons purchasing the same from the director. The scope of the petitions will be limited, in so far as they attack the validity of the bonds of the first mortgage, to the subject-matter above stated.