CONTINENTAL TRUST CO. v. TOLEDO, ST. L. & K. C. R. CO. et al.

(Circuit Court, N. D. Ohio, W. D. April 1, 1898.)

1. RAILROAD COMPANIES—BONDS AND STOCK—VALIDITY.

Where one K. contracted to perform certain services in the reorganization of a railway company, for which he was to receive certain amounts of bonds and stock in the reorganized company, it being claimed that the bonds were issued for less than 75 per cent. of their par value, and were therefore void, under Rev. St. Ohio, § 3290, *held*, that the stock should be taken at its actual, and not at its par, value, in computing the amount received by the company for the bonds; that the stock so issued was not void by reason of its issue at less than par; and that the bonds were not void, it being determined by the above rule that their price exceeded 75 per cent of par.

2. SAME—PURCHASE BY DIRECTORS.

The purchase, by a director of a corporation, of bonds already sold in good faith to a third party, although such purchase be at less than par, does not fall within Rev. St. Ohio, § 3313, making void bonds so purchased by a director from the company.

3. CONTRACTS—VALIDITY—PUBLIC POLICY.

An agreement between one engaged in performing services in the reorganization of a railway company and the president of the company, by which the two are to become partners in a performance of the former's contract previously made with the company, and the president is to become entitled to part of the bonds which the contractor was to receive from the company, is void, as contrary to public policy, and vests in the president no title in bonds delivered to the contractor, and sold by him to third persons. Such bonds are not therefore void, under section 3313, on the ground that they were purchased by the president from the company at less than par.

4. SAME.

In the reorganization of a railway company, the bondholders of the old company consented to accept in place of their bonds preferred stock in the new company. As an inducement to them to consent to this, K., who was managing the reorganization, and who was to receive from the new company for his services a large amount of its bonds and stock, agreed to sell them a certain number of his bonds, giving them with each bond an amount of common stock of equal par value. Later, certain of these bondholders became directors, and purchased their bonds under this agreement while serving as such. *Held*, that these bonds were not void as having been issued to directors at less than par, because (1) they were not issued to the directors, but in good faith to K.; (2) there was no evidence to show that the concession made by them in accepting preferred stock for their old bonds was not worth as much as the stock bonus, so that the bonds in fact were sold at par; (3) they could not be held to have purchased them as directors, since they took them under a contract which was binding on all parties before they became such.

5. SAME—CORRUPT AGREEMENT BETWEEN CONTRACTOR AND PRESIDENT.

When a contractor enters into a corrupt agreement with the president of the corporation, which is the other party of the contract, such as would justify the corporation in rescinding the contract, but the contract is not rescinded, the corrupt relation is terminated before the termination of the original contract, and the work is satisfactorily completed, the fraudulent agreement will not avoid bonds issued to the contractor by the company in final settlement of their transactions.

6. CORPORATION—ACQUISITION OF PROPERTY—ASSUMPTION OF OBLIGATIONS.

When a corporation accepts title to property held by the vendor subject to the conditions of certain contracts, of which contracts the corporation has actual or imputed knowledge, it assumes the obligations of such contracts, without formal action by its directors.

86 F.—59

**7. SAME—CONSOLIDATION OF RAILROAD COMPANIES.**

Upon the consolidation of several railroad companies under the Ohio statutes, all the property of the constituent corporations becomes vested in the consolidated corporation, and all their obligations become binding upon it, immediately upon the election of its first board of directors.

**8. SAME—PREFERRED STOCK.**

In the absence of prohibition in the local law or in its charter, a corporation may issue preferred stock which shall be a lien upon its property and earnings second only to an existing first mortgage.

**9. SAME.**

The holders of such stock may not use it to make up the amount of their bid on foreclosure sale of the property, after paying adjudicated claims of creditors, as this would, in effect, be dividing the property of the corporation among them to the prejudice of any creditors not parties to the suit.

**10. CHANCERY PRACTICE—INTERVENERS.**

One coming into the cause under general leave granted to the cross complainants to bring in all other preferred stockholders to unite with them, who files his petition only a few days before the closing of evidence, may not enlarge the grounds of relief, even though he offers to rest his case on the evidence already in, and a petition attempting to do so, and filed without leave, will be stricken from the files.

Some aspects of this case have been previously considered. See Continental Trust Co. v. Toledo, St. L. & K. C. R. Co., 82 Fed. 642. It now comes before the court for final hearing on the merits. The suit is a consolidation of a creditors' bill and a bill to foreclose an alleged first mortgage lien upon the railroad of the defendant the Toledo, St. Louis & Kansas City Railroad Company (hereafter called the "Railroad Company"), a consolidated corporation of Ohio, Indiana, and Illinois. The road extends from Toledo, Ohio, to East St. Louis, Ill., a distance of 450 miles. The litigation was begun by Stout & Purdy, citizens of New York, judgment creditors of the Kansas City company, who filed a creditors' bill in this court on May 13, 1893, against the company on behalf of themselves and all other creditors. Other creditors were invited by advertisement to come in under the bill and file their claims before a master, and many have done so, and among these are a committee of first mortgage bondholders, representing all creditors of their class. Similar bills were filed at the same time in Indiana and Illinois, and the same receiver was appointed to operate the railroad pending the litigation, in the three jurisdictions. In December, 1893, the then trustees under the first and only mortgage, the Continental Trust Company of New York and John M. Butler of Indiana, filed a bill in this court to foreclose the same. The receivership created under the creditors' bill was extended to the foreclosure suit, and an order was made consolidating the two suits, and giving to the consolidated cause the title of foreclosure suit. The foreclosure bill made defendants not only the company, but also several judgment creditors. It set forth the corporate organization of the company. the issue by it of $9,000,000 of bonds which had passed into the hands of holders for value, the execution and delivery of a mortgage upon the railroad and property of the company to secure the same, the default in the payment of interest on the bonds. and the acceleration of the maturity of the bonds by the written request of a majority of the bondholders six months after default, in accordance with the terms of the mortgage. The answer of the company declined to admit the validity of the consolidation of the three constituent companies of Ohio, Illinois, and Indiana, declined to admit the validity of the bonds or the power of the company to issue them or the mortgage securing them, and denied default in the bonds or their maturity. The judgment creditors who were made defendants (Stout & Purdy, Julius Bache, and Ferdinand Canda) in their answers also denied the validity of the consolidation which began the corporate existence of the defendant, the power of the company to issue the bonds and mortgage, the fact that the bonds were held by those who gave value for them, and the default or accelerated maturity. They set up their own judgments, and averred their priority over the bonds. The answers of the other defendants did not impeach the validity of the bonds or of the company's incorporation.

After a controversy which was finally settled in the circuit court of appeals

for this circuit in Hamlin v. Trust Co., 47 U. S. App. 422, 24 C. C. A. 271, and 78 Fed. 664, Hamlin and others, as representatives of the preferred stockholders of the company, were permitted to file a separate answer to the bill of foreclosure, and a cross bill. The answer denies the validity of the bonds, and sets out at length the ground for such denial. It avers that the bonds were issued under a contract with one S. H. Kneeland, by which, for $9,000,000 of bonds and $12,250,000 of stock, Kneeland agreed to pay off the liens upon the road, which was then a narrow-gauge railroad, and to rebuild the road, making it of standard gauge; that Kneeland, by reason of his influence as owner of the common stock, fraudulently procured the issue to him of the bonds and stock without having performed his contract, and without expending more than $5,000,-000, and without paying off $700,000 of the underlying liens on the road; that the issue of bonds and stock for less than one-third their value was in violation of the laws of Ohio, Indiana, and Illinois; and that those who bought the bonds, and now hold them, knew of these facts in respect to their issue, and cannot recover, and ought not to recover, more than the amount of money's worth which the company received for them. By the cross bill the Hamlins ask that an account be taken of the amount actually received by the company for said bonds, averring that if such account is taken it will appear that no default in interest has taken place. They further pray that the court shall declare the right of the preferred stockholders to a second lien next after that of the first mortgage bondholders and superior to any debts, and that, after the amount due under the first mortgage has been ascertained, they may have the right to redeem. The complainant filed an answer to cross bill denying the lien of the preferred stock, and denying the allegations upon which the invalidity of the bonds is asserted by the Hamlins. In December, 1897, upon advertisement ordered by the court, upon the petition of the Hamlins, inviting other preferred stockholders to come in and become complainants in their bill, one S. Dana Rose filed an intervening petition without leave, showing that he held preferred stock, but that he could not join in all the averments of the Hamlin answer and cross bill. In his petition he attacked the validity of the bonds on more extended grounds. He averred that when Kneeland made his contract one Quigley, chairman of the committee of bondholders of the narrow-gauge roads and subsequently president of the consolidated company, was secretly interested with him in the profits of the contract; that the contract was voidable for fraud, and was in violation of the statutes of Ohio; and that the bonds issued in accordance with it were void. A motion was made to strike this petition from the files.

So much for the pleadings on the foreclosure side of the consolidated cause. Under the creditors' bill, also, issues as to the validity of the bonds were raised by intervening petitions of the same judgment creditors who had filed answers to the foreclosure bill. These petitions attacked the validity of more than half of the $9,000,000 of bonds, on the ground that they were absolutely void under a section of the statutes of Ohio which declares that all bonds issued to directors at less than par shall be null and void. Rev. St. Ohio, § 3313. The petitions also averred that the entire issue of bonds was void because sold by the company for less than 75 per cent. of par, in violation of another section of the Ohio statutes.

Another controversy in this many-sided cause arises between the Hamlins, representing the preferred stockholders, on the one side, and the defendant company and its common stockholders on the other. By virtue of a clause in the certificates of preferred stock, the preferred stockholders claim in their cross bill a lien on the property next after the mortgage bondholders and in priority to other debts. On the appeal heard in the circuit court of appeals already alluded to (47 U. S. App. 422, 24 C. C. A. 271, and 78 Fed. 664), it was settled by the decision of that court that the lien declared in the certificates of preferred stock gave them no priority over any debts of the company, but only a priority in the division of the assets of the company after payments of its debts, as between them and the common stockholders. The company and the common stockholders both filed answers to the preferred stockholders' cross bill, and averred that the language in the certificates of preferred stock upon which the claim of a lien depended was inserted in them by fraud, and without any authority, either in the articles of incorporation or the resolutions of the directors, and had no effect to create such a lien. Evidence was taken on this issue also. It derived importance from the motion made on behalf of the preferred stockholders for the

insertion of a clause in the decree for sale permitting redemption by them, and allowing them, should they conclude to purchase the road at the judicial sale, to pay their bid, after depositing cash enough to pay off the costs and all the debts of the receivership and the company, by depositing shares of the preferred stock.

The main issues in the case are therefore: (1) Are the bonds void because issued to S. H. Kneeland under contract at a price less than 75 per cent. of par, in violation of section 3290 of the Revised Statutes of Ohio? (2) Are the bonds or any of them void because issued directly or indirectly to directors at less than par, in violation of section 3313 of the Revised Statutes of Ohio? (3) Are the bonds to be defeated because of Kneeland's alleged fraud in performing the contract, made possible, as it is charged, by his giving Quigley, the president of the company, a secret interest in the profits of the contract? (4) Is the language of the certificates of preferred stock, purporting to secure to its holders a lien on the property of the road, binding on the company and its common stockholders? If so, does it give the preferred stockholders a priority in the distribution of assets of the company, as between them and the common stockholders?

With the issues thus stated, it becomes necessary now to give a history of the construction of the railroad and the issue of the bonds. In 1882 the railroad that is the subject of this litigation was a narrow-gauge line, running from Toledo to St. Louis, and was owned by the Toledo, Cincinnati & St. Louis Railroad Company, a consolidated corporation of Illinois, Indiana, and Ohio. It was 450 miles in length. It had a total mortgage indebtedness of about $10,000,000, and a capital stock of the par value of $21,000,000. It was divided into two divisions, upon which the first mortgages aggregated $5,000,000. On the 9th day of April, 1884, the holders of the first mortgage bonds upon the two divisions, by two agreements, constituted two committees, of five members each, to protect their respective interests in the purchase of the two divisions of the road then about to be sold, and to effect a reorganization of the two divisions, united in one road, upon a plan stated in the agreements. The plan embraced the issue of first mortgage bonds to the extent of $15,000 a mile with which to rebuild and widen the gauge of the road, and the issue of $7,000,000 of second mortgage bonds with which to take up the first mortgage bonds of the two divisions. The agreement gave the trustees very wide powers and discretion in the working out of the scheme of reorganization. In the latter part of 1885, James M. Quigley, who was chairman of the two committees, made a preliminary contract with S. H. Kneeland, by which Kneeland agreed to bid in the two divisions of the old road at the foreclosure sale, to be held in the following January, and to advance the cash which it was necessary to deposit in order to become a bidder at the sale. The preliminary agreement looked to a subsequent agreement by which Kneeland was to be given the first mortgage bonds on the narrow-gauge road, and with them to assume all the obligations of the purchaser imposed by the decree for sale, to convey the road to a newly-organized consolidated corporation of Ohio, Indiana, and Illinois, and, as contractor, to rebuild the road and widen its gauge. Kneeland made the necessary deposits, and bid in the two divisions at the sale. Upon January 23, 1886, after the sale, he made with the two bondholders' committees the two contracts under which the bonds here in controversy were subsequently issued. The agreements are in all substantial respects similar. By these contracts Kneeland on his part agreed: (1) To complete the purchase in accordance with the terms of the decree, which required the purchaser to pay off receiver's certificates and other underlying liens prior in right to the first mortgage bonds. (2) To form three corporations, of Ohio, Indiana, and Illinois, respectively, to each of which he would convey the part of the road lying in the state of its organization, and then to consolidate them into a corporation of the three states. (3) That the consolidated corporation should change the gauge of the road from narrow to standard width, lay down steel rails of not less than 60 pounds to the yard of main line, widen all embankments and cuts to the requisite width, widen, strengthen, and rebuild bridges as the same might be necessary, construct all necessary stations, tanks, houses, repair shops, and sidings, so that the said road, reaching from Toledo to East St. Louis, should "in all respects be a first-class road of standard gauge," and equip the road with all necessary cars of every description, and with requisite motive power, and use, of the $1,000

bonds of the company to be issued, the proceeds of at least four per mile in the purchase of the equipment. (4) Kneeland agreed to complete the construction and equipment, and deliver the road to the new consolidated company, on or before the 1st of July, 1888, unless he encountered unforeseen obstacles, in which case the bondholders' committees were to have the power to extend the time for one year. (5) To pay the interest that might accrue on the newly-issued mortgage bonds pending the periods of construction. The net earnings of the company during this period were to be devoted to such betterments as seemed desirable to the company. (6) To pay all the expenses of the two committees in litigation and reorganization and their compensation.

It was further provided that, as a consideration for the performance of these obligations, the consolidated company would be required: (1) To issue $9,000,-000 of 6 per cent. bonds, or $20,000 a mile, secured by a first mortgage. (2) To issue $5,805,000 of nonvoting stock, in $100 shares, having coupons attached payable semiannually, at the rate of 4 per cent. per annum if earned, but noncumulative, and convertible into common stock after five years, and before ten years, and if not converted to become a preferred 4 per cent. noncumulative nonvoting stock. (3) To issue $11,250,000 of common stock, or $25,000 a mile. (4) To issue the bonds, preferred stock and common stock, at once, to two trustees, one to be selected by Kneeland, and the other by the bondholders' committee, for distribution.

According to the contract, the trustees were: (1) To deliver to Kneeland $2,-600,000 in bonds and $2,500,000 in common stock, at once. (2) Thereafter, as the work of construction and equipment progressed, to deliver the remaining bonds and common stock to Kneeland according to the value of the work done and equipment furnished, as certified by the chief engineer of the company. (3) To deliver $1,000,000 of the preferred stock to Kneeland to aid in the purchase and payment of the underlying liens, as the satisfaction of the same should be certified by the clerk of the court. (4) To deliver $4,805,000 in preferred stock to the holders of the old narrow-gauge first mortgage bonds, on the basis of 15 shares of $100 each for one bond of $1,000 on one division, and 10 shares for one bond on the other division.

It is further provided that the bondholders' committee (1) should deliver all their first mortgage narrow-gauge bonds to Kneeland to enable him to complete his contract of purchase; and (2) should litigate all claims made for liens prior to these bonds as he should request, but at his expense.

Soon after the signing of the contracts, Kneeland proceeded to organize three corporations, one of Ohio, called the "Toledo, Dupont & Western Railway Company," one of Indiana, called the "Bluffton, Kokomo & Southwestern Railroad Company," and one of Illinois, called the "Toledo, Charleston & St. Louis Railroad Company." To the first, by deed of June 12, 1886, he conveyed all of the railroad lying in Ohio in consideration of all its capital stock; to the second, by deed of June 11, 1886, he conveyed all of the railroad lying in Indiana in consideration of all its capital stock; and to the third, by deed of April 1, 1886, he conveyed all of the railroad lying in Illinois in consideration of its capital stock. At the same time he made contracts with the three companies of a similar character. It will be sufficient to state briefly his contract with the Ohio company. The recitals refer to the foreclosure proceedings of the old narrow-guage consolidated company, the Toledo, Cincinnati & St. Louis, and Kneeland's purchase of the railroad at the foreclosure sale. Kneeland agreed to convey the Ohio part of the railroad to the Ohio company, agreed that the companies of Indiana and Illinois organized by him, to whom he would convey or had conveyed the remainder of the road, would consolidate with the Ohio company, so that a new consolidated company should become the owner of the continuous line from Toledo to East St. Louis; and agreed that the consolidated company should, without delay, broaden the guage of the road to a standard guage, should lay the track with steel rails weighing not less than 60 pounds to the yard, and should make said line a first-class standard-guage railroad in all respects, and equip the same with proper rolling stock and motive power. The Ohio company on its part agreed—First, to issue all its capital stock to Kneeland; second, agreed that the consolidated company, formed as before provided, should issue, in full and complete payment for the broadening of the guage, the reconstruction of the railroad, and its equipment, "and for the purpose of exchanging some of said stock and securities with the holders of certain

securities issued by the companies heretofore owning and controlling said railroad and property, or portions thereof, for the payment of certain debts, underlying liens, rights of way, and other corporate purposes," $9,000,000 of bonds, $11,250,000 of common stock, and $5,805,000 of preferred coupon convertible stock. The three corporations were then consolidated, and the organization of the new company was effected on the 19th of June, 1886.

The articles of incorporation of the consolidated company described the preferred stock as. follows: "Of said capital stock, $5,805,000, being 58,050 shares thereof, shall be four per cent. preferred coupon convertible stock, with right to vote only after conversion." The articles of association of the consolidated company provided that the first board should consist of James M. Quigley, Isaac W. White, and Robert G. Ingersoll, of New York, together with 10 others named thereof, and that the first officers of the company should be James M. Quigley, president, and Isaac W. White, secretary and treasurer. The first meeting of the stockholders and directors was held on the 19th of June, and Quigley was elected president, and White secretary and treasurer accordingly. The board of directors then passed resolutions authorizing the issue of the bonds and stock provided in the articles of association and the contracts of January 23, 1886. There was no formal confirmation of the contracts of January 23, 1886, by the board of directors of the company, but they proceeded at once to conform to the provisions of that contract in the issue of the stock and bonds, and in their delivery to trustees. Kneeland selected Robert G. Ingersoll as his trustee, and the bondholders' committee selected Isaac W. White as their trustee, the two to hold the bonds and stock, and deliver the same to Kneeland as the contract required. On the 6th day of July, 1886, some 17 days after the organization of the consolidated company and the passage of the resolution to issue the bonds and stock, Quigley and Kneeland signed a contract, and, placing it in an envelope, delivered it to R. G. Ingersoll to hold for them, without revealing to him its contents. It was as follows:

"Memorandum of agreement between Sylvester H. Kneeland, of the first part, and James M. Quigley, of the second part: Whereas, the party of the first part. on the twenty-third of January, 1886, made certain contracts for the reconstruction, widening of the gauge, and equipping of the line of railroad from Toledo to East St. Louis, now known as the Toledo, St. Louis and Kansas City R. Co., said contracts having been made with the first mortgage bondholders' committee or the trustees, respectively, of the lines of road heretofore known as the Toledo and St. Louis Divisions of the Toledo, Cincinnati and St. Louis R. R. Co., contracts of like character and tenor having been since made with the Toledo, Charleston and St. Louis R. R. Co., the Bluffton, Kokomo and Southwestern R. R. Co., and the Toledo, Dupont and Western R. R. Co., being the companies forming by consolidation the Toledo, St. Louis and Kansas City R. R. Co., before mentioned; and whereas, the party of the first part, owing to the complicated and hazardous character of the contracts above referred to, having been unable to associate with himself therein such persons as he desired and anticipated, and now finds himself alone and in danger of failure to accomplish all he has undertaken, and for these reasons, and to better carry out the great work in hand, finds it necessary to avail himself of the extended acquaintance and great knowledge and experience possessed with respect to the railroad property by the party of the second part: Now, therefore, in consideration of the premises, and other valuable and sufficient considerations here to him moving, the party of the first part hereby associates with himself the party of the second part as full partner equally in all the contracts above mentioned. Any profit to be made thereby to be equally divided,—that is to say, each to be entitled to one-half of such profits; and the party of the first part declares he has no associate or partner in said contracts but the party of the second part. It is agreed between the parties hereto that their respective duties shall be as follows: The party of the first part to have charge of the reconstruction and financial arrangements therefor, and negotiations looking to alliance with other companies. The party of the second part to attend to the closing up of the trust created under a certain trust deed or agreement dated April 9th, 1884, to conduct and have charge of the various litigations, all references involving the purchase money fund in court, conflicting title, and all lawsuits pertaining to the line of said Toledo, St. Louis and Kansas City R. R. Co., and to manage the business other than financial of the R. R. Company. If owing to illness

or any other cause the party of the second part should be unable to perform his duties as above, there is to be deducted from his share of the profits, before a final division, the amount required to pay the persons other than legal counsel who may be employed to take his place and do his work. The party of the first part in his department to be without restriction, except that he shall not close negotiations tending to reduce the interest or profits of the party of the second part without the consent of the party of the second part. Any profits in securities or money, withdrawn before the completion of the contracts, shall be divided equally at the time.

"Witness our hands and seals this eighth (8th) day of July, A. D. 1886.
     "[Signed]                                          J. M. Quigley. [Seal.]"

On September 8, 1887, Quigley and Kneeland dissolved their relations under this contract, and a partial settlement was had. A complete settlement, however, was not effected until July 5, 1889, and resulted in Kneeland giving to Quigley 180 bonds of the railroad company in compromise of his claims. Between the 19th of June, 1886, and the 7th of September, 1887, $1,550,000 of the bonds were delivered by the trustees to Kneeland. On September 14, 1887, the original contract of January 23, 1886, in so far as it provided that the net earnings of the road should be devoted to the betterments during the period of construction, was amended so that the net earnings were to be set aside and used for the payment of interest on the first mortgage bonds, Kneeland agreeing to supply any deficiency in such interest until the completion of the contract. It was further provided with reference to the rolling stock that he was to apply the proceeds of four bonds per mile to the purchase of rolling stock, and that the money thus applied should equal the average of what he might receive for all bonds delivered on account of construction, provided that in no event should the amount be less than 75 per cent. of the par value of the bonds. This agreement was subsequently modified so as to provide that Kneeland should expend for rolling stock cash equal to 82½ per cent. net of the par value of four bonds per mile. Kneeland did not complete the road at the time fixed in the contract, July 1, 1888, and several extensions were granted. Controversies arose between him and certain directors of the company and between him and the old bondholders' committee as to whether or not he was performing his contract. On June 1, 1891, Kneeland and the railroad company entered into an agreement of compromise. In this agreement Kneeland admitted that he was under obligation to pay into court sufficient cash on account of the purchase of the old road to satisfy all unpaid underlying liens. He further agreed to pay the company $367,000 in compromise of all claims against him, in consideration of which the company promised to deliver to him the bonds remaining out of the issue of the $9,000,000, and the common stock remaining out of the issue of $11,250,000, which it was provided in the original contract should be delivered to him. The bonds and stock were to be held by the company or to be pledged as collateral for notes by which the $367,000 was to be raised. Of the $367,000, $100,000 represented the amount which it was agreed was necessary to complete the road in accordance with Kneeland's contract, and $260,000 represented the amount which was required to pay the coupons on the bonds falling due July 1, 1891. It was further agreed that the railroad should be considered as delivered under the contract as of December 30, 1890. This compromise was agreed to, not only by the railroad company, but also by the committees of the narrow-gauge bondholders. The contract of compromise has not been fully complied with by Kneeland, but it is not necessary to state with exactness exactly what the failure of performance consists in. The contract left Kneeland still liable to pay all the underlying liens on the road which had not been paid (amounting to more than $500,000), and submitted to arbitration the question as to the extent of his liability for failure to make the necessary water-front improvements at the company's dock in Toledo under his original contract.

The certificates of preferred stock issued by the company were of the form following:

"Toledo, St. Louis & Kansas City Railroad Company.
"No. ———.               Preferred Capital Stock.               10 Shares.
"This is to certify that James M. Quigley, or bearer, is entitled to ten shares, of one hundred dollars each, of the preferred nonvoting capital stock of the

Toledo, St. Louis and Kansas City Railroad Company. This constitutes a lien upon the property and net earnings of the company next after the company's existing first mortgage. It does not entitle the holder to vote thereon. After the first day of January, 1888, it is entitled to and carries interest at the rate of four per cent. per annum, payable semiannually, represented by interest coupons attached to this certificate. Such interest is only payable out of the net earnings of the company after the payment of interest upon its existing first mortgage bonds and the cost of maintenance and operation. A statement showing the business of the company for the half of its fiscal year next preceding shall be exhibited at the office of the company in New York to the holder of this certificate, at the maturity of each interest coupon, and the net earnings applicable to such interest shall be reckoned for such period. Such interest is not to accumulate as a charge, and the coupons representing unearned interest must be surrendered and canceled on the payment in whole or in part of a subsequently maturing coupon. At any time after the first day of January, 1898, this certificate may be converted into the common capital stock of the company. If not converted then, to become a preferred four per cent. noncumulative stock. The company will create no mortgage of its main line other than its first mortgage, nor of any part thereof, except expressly subject to the prior lien of this certificate, without the consent of the holders of at least two-thirds of this stock present at a meeting. of which reasonable personal notice must be given to each registered stockholder, and by publication for at least three successive weeks in two leading daily newspapers published in the cities of New York and Boston. One-third of the entire issue of this stock present in person or by proxy shall constitute a quorum. Nor will the company increase the issue of these certificates of stock without consent obtained as above. These certificates of stock shall be transferable by delivery or by transfer on the book of the company in the city of New York, after a registration of ownership certified hereon by the transfer agent of the company.

"Countersigned:
"American Loan & Trust Company,
"By ————.

"New York, June 19, 1886. ————, President.
"————, Secretary.

"Shares, $100 Each.

"The Toledo, St. Louis and Kansas City Railroad Company will pay to bearer, on the first day of January, 1898, upon the surrender of this warrant at its office or agency in the city of New York, any amount that may be due hereon, under the conditions set forth in the certificate of stock to which this is attached, not exceeding the sum of twenty dollars.

"Coupon No. 20. No. ————.
"Isaac White, Secretary."

The contention of the common stockholders of the company is that the words contained in the foregoing certificate, "This stock constitutes a lien upon the property," was inserted without authority, by the president or some one acting for him, in the printing of the certificates, and that the words were authorized neither by the contract of January 23, 1886, nor by the resolutions of the board of directors. The resolution of the directors recites an agreement between the constituent companies and the consolidated company with Sylvester H. Kneeland, by virtue of which the consolidated company was to execute $5,508,000 of fully-paid preferred coupon convertible stock, for the purpose of exchanging it with holders of certain securities issued by the constituent companies forming by consolidation of the Toledo, Cincinnati & St. Louis Railroad Company of Ohio, Indiana, and Illinois, and for such other corporate purpose as might be deemed necessary. It was therefore resolved that there should be issued $5,805,000, par value, of the fully-paid preferred coupon convertible stock of this company in pursuance of the said contract and articles of agreement and consolidation, for the purposes therein specified; and the president and secretary were authorized to issue, under the corporate seal of the company, proper certificates for said stock, and to deliver the same to ————, trustees. At the time of the execution of the contracts of

January 23, 1886, and in order to secure the consent of the trustees of the old bondholders to that agreement, Kneeland says he made a verbal stipulation that, in consideration of the old bondholders surrendering their bonds to him, and accepting in lieu thereof preferred stock in the consolidated corporation to be formed in accordance with the terms of the contract, he would sell, to the holders of the old narrow-gauge bonds, bonds and common stock of the new corporation at the rate of $1,000 cash for one bond and ten shares of the common stock, each bondholder to be allowed to take as many of the new bonds under this arrangement as he had of the old narrow-gauge bonds. This obligation Kneeland recognized in October, 1886, by a letter written to Ingersoll and White, trustees, and under that option $1,362,000 par value of the bonds and 13,362 shares of stock were bought by the old bondholders. Of this amount John C. Havemeyer, who was then a director, subscribed for and received 88 bonds and 880 shares of stock; Joseph S. Stout, also a director, in his own name and in the name of his firm of Stout & Co., received 443 bonds and 4,430 shares of stock; Charles T. Harbeck, also a director, received 10 bonds and 100 shares of stock; James M. Quigley, also a director, received 261 bonds and 2,610 shares of stock; Clarence Brown, also a director, received 13 bonds and 1,300 shares of stock.

Cary & Whitridge and Henry Crawford, for complainant.

Lawrence Maxwell, Jr., for Railroad Co.

Spiegelberg & Wise, for Jules S. Bache.

W. B. Sanders, J. D. Springer, Potter & Emery, and Smith & Baker, for intervening petitioners.

TAFT, Circuit Judge.    The first question to be considered is whether the issue by the defendant company of $9,000,000 of bonds to S. H. Kneeland, under the contracts of January 23, 1886, was in violation of the Revised Statutes of Ohio, and especially section 3290 thereof.

Section 3286 provides that a railroad company in Ohio may issue bonds, convertible or otherwise, bearing a rate not exceeding 7 per cent. per annum, to an amount not exceeding two-thirds of its capital stock, and that it may secure the bonds issued for such purpose by mortgage on its property.

Section 3287 provides that a company may borrow money, at a rate not exceeding 7 per cent. per annum, for any purpose that the same may be needed in its business, and execute bonds or promissory notes therefor in sums of not less than $100, and it may secure the payment of such bonds and notes by a pledge of its property and income; but the aggregate indebtedness authorized by this and the preceding section shall not exceed the amount of the capital stock of the company.

Section 3288 provides that the mortgage may include the personal as well as the real property of the company.

Section 3289 provides how the mortgage shall be recorded.

Section 3290, which is the particular section here involved, is as follows:

"The directors of the company may sell, negotiate, mortgage or pledge such bonds or notes, as well as any notes, bonds, scrip, or certificates for the payment of money or property which the company may have theretofore received, or shall hereafter receive, as donations, or in payment of subscriptions to the capital stock, or for other dues of the company, at such times and in such places, either within or without the state, and at such rates and for such prices at not less than seventy-five cents on the dollar, as in the opinion of the direct-

ors will best advance the interests of the company; and if such notes or bonds are thus sold at a discount without fraud, the sale shall be as valid in every respect, and the securities as binding for the respective amounts thereof, as if they were sold at their par value."

There is no express restriction in the statutes of Ohio upon the price at which such stock, common or preferred, of a railroad company, shall be sold, except when it is purchased by a director.

Were the bonds of the company sold for less than 75 per cent. of their par value? I have read with care all the evidence which has been produced in this case, aggregating, possibly, 5,000 pages of typewritten evidence, in order to determine how much in money's worth the company received for the $9,000,000 of bonds which were issued by it to Kneeland, the contractor. Under the contract, Kneeland received $9,000,000 of bonds, $11,250,000 par value of common stock, and $1,000,000 par value of the preferred stock. If we find what was actually spent in constructing the road, and in paying off the underlying liens, and in meeting the other obliga-tions of the contract assumed by Kneeland, including that paid by him as interest on the bonds during the period of construction, and deduct therefrom the value of the common and preferred stock which he received, together with the amount received by him from the net earnings of the road during the period of construction, and the amount received by him from the sale of old material taken from the narrow gauge, we shall have in the remainder what the company received for its issue of $9,000,000 of bonds. The evidence shows that Kneeland disbursed at Toledo through his cashier, Crowell, for construction, $3,509,317. It was claimed that in this construction Kneeland did more than his contract required. I do not think, from an examination of the evidence and the proper construction of the contract, that this claim can be sustained. However this may be, it is clear that by the settlement of June, 1891, Kneeland waived all his claims for extras, so that the company got the benefit of this expenditure as if it were under the contract. For iron bridges, fences, and other betterments, Kneeland expended approximately $500,000. For steel rails, he expended $1,528,179. The interest which he was obliged to pay on the bonds, issued between July 1, 1886, and June 1, 1891, aggregated $1,766,-465. This result I have reached by actual calculation of interest upon the bonds as they were delivered to him, allowing a reasonable time for his sale of them or disposition of them by way of collateral after he received them. It includes the $260,000 of interest which he stipulated to pay and did pay in June, 1891. Kneeland makes a general statement, unsupported by memoranda, that the net earnings paid the interest. This is wholly erroneous. He did not receive in net earnings more than $1,220,000, and probably he received much less. At the time of the compromise, in June, 1891, it was agreed between the parties that $100,000 would complete the road according to Kneeland's contract, and the company withheld enough of the bonds and the stock to secure this acknowledged indebtedness from Kneeland. Of the underlying liens, which aggregated $1,100,000, and which Kneeland had agreed to pay, he

paid $650,247. He paid out in cash for equipment $1,314,071. His contract required him to spend 82½ per cent. of $1,800,000, or $1,485,000, and this is what counsel for the company concedes to have been spent, but I can find no evidence of more than the sum stated. These items aggregate $9,368,279. To this must be added a reasonable contractor's profit, which, considering the risk and expense attendant upon the execution of such a contract, I cannot fix at less than ten per cent. of the foregoing expenditures, or $936,827. The benefits received by the company, therefore, are $10,305,106. To assist him in paying the sums thus expended, the contractor received, under the contract, from old material, a sum he estimates at $200,000. He received no net earnings for the years ending June 30, 1887, and June 30, 1888, with which to pay interest. The net earnings for the year ending June 30, 1889, are not given in evidence, but, in view of the amount of gross earnings, which was $764,000, and in view of the then condition of the road under construction, they certainly could not have exceeded $200,000. The net earnings for the year ending June 30, 1890, were $470,352, and for the year ending June 30, 1891, were $549,962. The amount of common stock was $11,250,000. Counsel for the company and the intervening petitioners claim that this was worth 15 per cent. of par. I think that the stock had no such value, and that Kneeland could at no time have sold all his holdings at that price. But, assuming that he could, he received in common stock money's worth to the amount of $1,687,500. Taking the estimate of the same counsel, the money's worth of the preferred stock of the par value of $1,000,000 received by Kneeland was 30 per cent. of par, or $300,000. This makes a total of $3,407,814. Deducting this from the value of the benefits received by the company, it leaves a remainder of $6,897,292 as the consideration which the company received for $9,000,000 of bonds, or something more than 76 6/10 per cent. of par.

The foregoing, stated in tabular form, is as follows:

Paid out by Kneeland:

| | |
|---|---:|
| Construction disbursed through Crowell | $ 3,509,317 |
| Steel rails | 1,528,179 |
| Iron bridges, etc. | 500,000 |
| Allowed by Kneeland for completion of road | 100,000 |
| For interest on bonds down to June 1st, 1891 | 1,766,465 |
| For equipment | 1,314,071 |
| For lien claims prior to mortgage | 650,247 |
| Profit—10% on cash paid out | 936,827 |
| | $10,305,106 |

Received by Kneeland:

| | | |
|---|---:|---:|
| Old material (est.) | $ 200,000 | |
| Net earnings year ending June 30, '89 | 200,000 | |
| Net earnings year ending June 30, '90 | 470,352 | |
| Net earnings year ending June 30, '91 | 549,962 | |
| Value of common stock | 1,687,500 | |
| Value of preferred stock | 300,000 | |
| | | $ 3,407,814 |
| Balance consideration for $9,000,000 bonds | | $ 6,897,292 |

—or 76 6/10 per cent. of par.

This calculation has been made on the hypothesis that under the compromise of June, 1891, Kneeland enjoyed the benefit of the net earnings for the six months from January 1, 1891, to July 1, 1891. He expressly agreed in the contract of compromise to pay the interest on the bonds for that period, but it seems probable that he did not receive either the earnings or credit for them, because, by the terms of the compromise, the road was to be considered as delivered to the company and accepted by it as of December 30, 1890. If this be true, then the consideration received by the company for the $9,000,000 of bonds, as stated above, would be increased $279,981. There are other expenditures of Kneeland, such as compensation to the trustees and bondholders' committees, which inured to the benefit of the company, and probably ought to increase the above estimate of the value of the consideration received by the company from Kneeland for its bonds. In addition to this, Kneeland failed to complete his contract in regard to the underlying liens, which liens to the amount of at least $450,000 remain unpaid. Now, the company did not receive this benefit, but it has a claim against Kneeland for this amount. Surely, the validity, under section 3290 of the Revised Statutes of Ohio, of a contract for the sale of bonds, and of the bonds delivered under such a contract, is not to be destroyed because the contractor in his performance may have fallen short of the requirements of his contract, if the company in good faith insisted on performance, and only failed in obtaining its right because of the insolvency of the contractor. On the whole, therefore, a careful examination of all the evidence discloses to my entire satisfaction that the company actually received under the contract more than 75 per cent. of par for its bonds, and is entitled to receive and would receive, were Kneeland able to pay his debts to the company, a considerably higher percentage than this for them.

The argument is pressed upon the court that in calculating the amount which the company received for the bonds it should divide the value of the benefits received by the company in the ratio of the par value of the bonds, the common stock, and the preferred stock received by Kneeland, and fix the consideration paid by the contractor for the bonds as that part of the total money's worth given by Kneeland to the company which bears the same ratio to the total money's worth as the par value of the bonds bears to the total par value of all the securities, including the bonds delivered to Kneeland. The total par value of the securities was $21,250,000, and the proposition is that the court is to say that, of the benefits received by the company under the contract, it received for its bonds only $9/21$ of the whole, and thus that the company got for its bonds something less than 50 per cent. of their par value. This is not a fair or equitable way in which to treat an executed contract. The sections of the statute under consideration impose no limit upon the price at which the stock of the company might be sold. But it is said that it is a rule of general corporation law that stock must not be sold at less than par. I have considered the question of the validity of the stock and bonds under this contract of January 23, 1886, in a former opinion in this case (82 Fed. 642, 656), where I

reached the conclusion that under the decision of the supreme court of the United States in Railroad Co. v. Dow, 120 U. S. 287, 7 Sup. Ct. 482, the contract was not illegal, so far as the stock was concerned, though the amount of value received therefor was not equal in money value to the par value of the stock.    Whether the stockholders might be liable, as against creditors, to pay any sum as an assessment upon the stock, though on its face full paid, is a question not before the court.    It suffices to hold that stock issued under a contract like that of the reorganization plans in Railroad Co. v. Dow, and in this case for material and labor of a value less than the par of the stock, is neither illegal nor void.    Counsel for the company and the intervening petitioners in their brief concede that the common stock was worth but 15 per cent. of par, and the preferred stock but 30 per cent., when Kneeland received them.    Why, then, give them a value in the contract which they did not have?    It is clear to a demonstration that if from the value of the total consideration received by the company under the contract is deducted the value of the preferred and common stock at market rates, what remains is the amount received by the company for its bonds.    This accords with the substantial verities of the transaction.    The bonds were secured by a mortgage upon the entire property of the company, and, unless the bonds were well secured, neither the preferred stock nor the common stock was worth anything.    It is palpable that both the company and the contractor regarded the bonds as the main source from which he was to obtain the money with which to perform his contract.    To hold that, in a contract like this, the parties intended to treat the different securities of equal value is to be blind to the plainest facts.

We come now to the second question, whether $4,445,000 of the bonds which were issued to Kneeland during the life of the contract of partnership between him and Quigley are to be held null and void, under section 3313 of the Revised Statutes of Ohio, providing that "all capital stock, bonds, notes or other securities of a company, purchased of a company by a director thereof, either directly or indirectly, for less than the par value thereof, shall be null and void." Kneeland testified that the contract of partnership between him and Quigley was really made January 23, 1886, at the time when the contract of construction was made between him and the trustees of the old bondholders, but that it was not formally reduced to writing until its date, July 6, 1886.    Kneeland's statement is contradicted by the recitals of the written contract itself, in which, after mention of the contracts of January 23, 1886, occurs the following:

"Whereas, the party of the first part [Kneeland], owing to the complicated and hazardous character of the contracts above referred to, having been unable to associate with himself therein such persons as he desired and anticipated, and now finds himself alone, and in danger of failure to accomplish all he has undertaken, and for these reasons, and to better carry out the great work in hand, finds it necessary to avail himself of the extended acquaintance and great knowledge and experience possessed with respect to the railroad property by the party of the second part [Quigley]:    Now, therefore, in consideration of the premises and other valuable and sufficient considerations hereto him moving, the party of the first part hereby associates with himself the party of the second part as full partner equally in all the contracts above mentioned."

It is urged by counsel, and pointed out by Kneeland, in his earnest desire to carry back the date of the contract of partnership with Quigley, that he signed the contracts of January 23, 1886, for himself and associates, as a circumstance corroborating his statement. that Quigley was then associated with him. The foregoing recital, however, takes away any significance which that circumstance might otherwise have. Moreover, it appears that long after Quigley and Kneeland were separated, and when he had no partner at all, Kneeland continued to sign receipts, "S. H. Kneeland and Associates;" showing that the term "Associates," as signed by him, should be given no especial weight. The question which the court has here to decide is whether it will believe Kneeland as a witness or believe the recital of the contract signed by Kneeland and Quigley when the contract was made. The contract was a secret contract, delivered in an envelope by Kneeland and Quigley to R. G. Ingersoll, counsel for Kneeland, to be held by him for them both. There would appear to be comparatively little motive for misstating in it the fact as to the time when the partnership began. In the present litigation there is apparently a very strong motive for Kneeland to state that Quigley was interested with him from the beginning. The personal feeling of Kneeland against Quigley and the large bondholders and preferred stockholders of the road has evidently become bitter. After the road was received by the company from Kneeland, and began its operations, differences as to the policy to be pursued arose. Indeed, the controversy had arisen between the same parties before the completion of the contract. Kneeland charges the bondholders, especially J. C. Havemeyer, H. O. Armour, and J. M. Quigley, with having intentionally brought the road to a condition in which a receivership was necessary, by refusing to consent to the imposition of the second mortgage with which to raise money to buy additional rolling stock. I have read Kneeland's testimony with care, and I am bound to say that the desire which he has to defeat the bonds which he himself sold so influences him in his evidence as to make his memory not altogether trustworthy. I think it much safer to credit the statement which he and Quigley together made in July, 1886, as to the time when, and circumstances under which, this partnership agreement was made. Kneeland's attitude in this case, in attempting to defeat the bonds which he sold in the open market to innocent purchasers, does not, under the circumstances, commend him as a witness to the court. It may be said that he is not a party to this issue. He is, however, the largest common stockholder, and is a director and the president of the company. He has elected the directors who are seeking to impeach the legality of the bonds by voting the very stock which, if the bonds are void for the reason asserted, is equally void. It is on his testimony and at his instigation that the attack is made upon the validity of the bonds based on his partnership contract with Quigley. That contract was a corrupt and disgraceful one, and a party to it who would bring it to light for the purpose of defeating the bonds sold by him to innocent persons cannot complain if no more credit is given him than the

corroborating circumstances require, especially when after producing it he contradicts the express recitals in the face of the contract. The circumstances shown by the record confirm the view that the contract was made at the day of its date. Under the contract of January 23, 1886, the bonds were to be delivered to the contractor by two trustees, one to be selected by Kneeland and the other by the bondholders' committee. Kneeland selected R. G. Ingersoll, who was his attorney, and the bondholders selected White, who, Kneeland says, was a mere clerk and puppet of Quigley. With these trustees, and with a chief engineer who was an appointee of Quigley and Kneeland, rested the whole supervision of Kneeland's execution of the contract. The trustees were not selected until after the organization of the consolidated company. It is perfectly evident that Kneeland's purpose in making his contract with Quigley was to bribe him to influence White to liberality in delivering the bonds, and to prevent too great strictness in guarding the interests of the company. Quigley was the president of the company. He was the chairman of the bondholders' committees, and knew more about the work to be done and the road as it was than any one. If he could be kept quiet, there would certainly be no trouble either with White or with any of the narrow-gauge bondholders who were the real parties in interest opposed to Kneeland. The contract as drawn was loosely drawn, but it was an onerous one for the contractor if strictly construed. Its burdensome character was much more apparent to Kneeland in the summer of 1886 than it had been in the preceding January, before he knew the extent of the heavy lien claims against the old narrow-gauge road which he had obligated himself to pay. Quigley knew all about these claims, and could doubtless prove of much assistance to Kneeland in fighting and adjusting them. This situation makes it altogether likely that the contract was really made when it was signed, that is, after the organization of the company, and after it had become certain that Quigley would have in his complete control the delivery of the bonds under the contract, so far, at least, as the trustee for the company and the narrow-gauge bondholders was concerned, and after the need for the services of Quigley in adjusting, fighting, and reducing prior lien claims had become apparent to Kneeland. There is in the record the sworn testimony of Quigley that the contract was made at the day it is dated, and not before, and that he had no interest in Kneeland's contract prior to that time. Counsel for the company and intervening creditors object to the consideration of this evidence on the issues between the bondholders and the company, because it was brought out on the issue between the company and the preferred stockholders. More than this, they say that, if evidence taken on the issue between the company and the preferred stockholders is to be considered, then the evidence of R. G. Ingersoll upon the same point corroborates Kneeland. Ingersoll's statement is entirely consistent with Quigley's having no interest in Kneeland's contract until the time when the contract was reduced to writing. His memory of dates is exceedingly vague, and can have no weight at this length of time after the

transactions. It is not necessary to decide whether Quigley's and Ingersoll's evidence can be here considered, because, whether it is admissible or not, I must reach the same conclusion.

The question, therefore, is whether the contract of July 6, 1896, between Kneeland and Quigley, makes the bonds issued to Kneeland and sold by him in the market bonds purchased from the company by Quigley. It must be premised that the contract for the purchase of bonds by Kneeland from the company was a lawful one, and had been fully entered into before Quigley attempted to acquire any interest in it. The evidence also shows that, during the time before Kneeland and Quigley quarreled and severed such relation as they had, the bonds were actually delivered by the trustees to Kneeland under the construction contract, and were sold by him, and that Quigley never had any custody of them for himself and Kneeland.

The claim on behalf of the company is that section 3313 renders bonds purchased by a director at less than par nothing but waste paper, even in the hands of subsequent innocent purchasers; and this, although the interest of the director may not be known to any one except himself and the person in whose name the bonds are bought. If the statute is to be thus construed, it is so highly penal and so capable of inflicting the grossest hardships upon innocent persons that its operation ought not to be extended beyond the letter. Under a strict construction, it may well be questioned whether one who acquires an interest in a construction contract with a railroad company after it has been made and its terms have been fixed, and without the knowledge or consent of the company, can be said to be a purchaser from that company of the bonds subsequently earned by performance of the contract. He derives all his rights in the contract by assignment from the original contractor, and his title to the bonds must be traced through the same person. It is said, however, that the language of the statute is, "purchased by a director directly or indirectly." These words mean that, if the contract of purchase is originally between the director and the company, the effect of the statute shall not be evaded through the mere use of another's name by the director in making the purchase. Certainly, a purchase from one who has in good faith bought bonds from the company is not an indirect purchaser from the company, within the statute.

But it is not necessary to discuss or to decide the question whether a third person acquiring an interest in Kneeland's contract of construction by lawful agreement would become a direct or indirect purchaser of bonds from the company, because it does not arise here. Quigley, by his agreement with Kneeland, acquired no interest whatever in the bonds to be delivered by the company to Kneeland under the construction contract. The contract was absolutely void, because corrupt, vicious, and against public policy. Neither Kneeland nor the company could have held Quigley to any liability under that contract, nor could Quigley have compelled Kneeland to account to him for any profits or bonds received thereunder. It is well settled that a secret contract made by one with

an agent of another to pay the agent a commission on transactions with his principal, effected through the agent, is against public policy and void, and that the agent cannot recover commissions thus stipulated for. Rice v. Wood, 113 Mass. 133; Smith v. Townsend, 109 Mass. 500; Railroad Co. v. Pattison, 15 Ind. 70; Lloyd v. Colston, 5 Bush, 587; Lynch v. Fallon, 11 R. I. 311; Everhart v. Searle, 71 Pa. St. 256; Scribner v. Collar, 40 Mich. 375; Carpener v. Hogan, 40 Ohio St. 203; Wald's Pol. Cont. (2d Ed.) 244, note z. See, also, City of Findlay v. Pertz, 31 U. S. App. 340, 355, 13 C. C. A. 559, and 66 Fed. 427.

In Rice v. Wood, 113 Mass. 133, 135, the court said:

"Contracts which are opposed to open, upright, and fair dealing are opposed to public policy. A contract by which one is placed under a direct inducement to violate the confidence reposed in him by another is of this character. If the plaintiffs were guilty of injustice to the owner of the real estate, by placing themselves under an inducement to part with it at less than its full market value, they should not be allowed to collect the promised commissions on the sale of the stock, which was the consideration for which they put themselves in such a position. No one can be permitted to found rights upon his own wrong, even against another also in the wrong. A promise made to one in consideration of doing an unlawful act, as to commit an assault or to practice a fraud upon a third person, is void in law; and the law will not only avoid contracts the avowed purpose or express object of which is to do an unlawful act, but those made with a view to place, or the necessary effect of which is to place, a person under wrong influences, and offer him a temptation which may injuriously affect the rights of third persons. Nor is it necessary to show that injury to third persons has actually resulted from such a contract, for in many cases where it had occurred this would be impossible to be proved. The contract is avoided on account of its necessarily injurious tendency."

In City of Findlay v. Pertz, 31 U. S. App. 340, 355, 13 C. C. A. 559, and 66 Fed. 427, Judge Lurton, speaking for the circuit court of appeals of this circuit, said:

"Any agreement or understanding between one principal and the agent of another, by which such agent is to receive a commission or reward if he will use his influence with his principal to induce a contract, or enter into a contract for his principal, is pernicious and corrupt, and cannot be enforced at law. This principle is founded upon the plainest principle of reason and morality, and has been sanctioned by the courts in innumerable cases."

See, also, Wald's Pol. Cont. (2d Ed.) note a[1] by Mr. Wald, and cases cited.

Of course, it makes no difference in the application of the principle whether the reward is for inducing a contract with a principal or for relaxing the watchfulness due the principal from his agent in enforcing a contract already made.

It follows that the Quigley-Kneeland contract was void, and conferred on Quigley no interest whatever in Kneeland's contract with the company. All bonds delivered by the company, therefore, belonged to Kneeland alone, and were therefore lawfully issued to him, and the persons to whom he sold or delivered them took his lawful title to them. This is even true of the 180 bonds afterwards delivered by Kneeland to Quigley at the so-called settlement of their partnership. Quigley had no claim upon Kneeland arising out of their corrupt agreement, and what he gave to Quigley was therefore without consideration. But what he gave was bonds theretofore lawfully delivered to him under the construction contract. Whether Kneeland could recover these bonds from Quig-

86 F.—60

ley, or would be prevented from doing so on the ground that they were in pari delicto, is not now important. It is certain that whoever is the owner of the bonds holds lawfully issued obligations of the company. Every holder of the bonds delivered to Kneeland during the pendency of the so-called partnership can trace his title to the company without using the corrupt partnership contract as the link by which the company issued the bonds. The contract between Kneeland and the company was complete before the void partnership agreement was made. Hence the rejection of that agreement as null and of no effect leaves the bonds with their origin untainted by illegality. I have said that Kneeland's construction contract was lawful. I do not mean to say that it might not at the time have been rescinded by the company for Kneeland's fraud in bribing Quigley to permit a lax execution of it. However that may be, until rescinded it was valid. After its complete execution, after a full settlement, and after the lapse of time since, certainly there could be no rescission. The illegality of the partnership agreement, and its ineffectiveness to vest any right or interest in the construction contract in Quigley, existed wholly without reference to section 3313 or its application, and hence may properly be regarded as a condition of the situation, when it is claimed that section 3313 operated to destroy the validity of the bonds delivered to Kneeland. In this view, bonds delivered to Kneeland under the valid construction contract were not purchased by Quigley, because the pretended contract from which it is said that his interest in the bonds arose could vest no interest in any one.

The next question is whether those bonds are void which were subscribed for and bought by Havemeyer, Stout, Harbeck, Quigley, and Brown when directors, under an agreement with Kneeland by which they paid $1,000 cash for one bond and ten shares of stock. Of these bonds, Havemeyer bought 88, Stout 443, Harbeck 10, Quigley 261, and Brown 13, or 815 in all. The bonds were not bought from the company. They were bought from Kneeland. The bonds in question had been issued in accordance with the construction contract by the company to the trustees, Ingersoll and White, to be delivered to Kneeland. They were part of the first 2,000 bonds which were to be delivered to him at once. He appointed White his personal agent and trustee to receive them for him from Ingersoll and White, trustees, and to accept subscriptions for them, on the terms above stated, from all holders of narrow-gauge bonds, to the extent of their holdings of those bonds. 1,362 bonds were subscribed for, of which 815 now under consideration were part. It is said that these directors are to be regarded as indirect purchasers from the company because, as directors, they issued the bonds under the contract of January 23, 1886, at a time when they had an agreement with Kneeland by which he was to sell to them the bonds and stock to be issued to him under his contract at less than par. Kneeland says the subscription agreement was really part of the contract of January 23, 1886. The narrow-gauge bondholders had expected to receive in exchange for their bonds second mortgage bonds of the new

company.   They were obliged to take preferred stock.    To make up for the difference in the value between the bonds surrendered to Kneeland and the preferred stock they were to receive in exchange therefor, Kneeland offered them a bonus of common stock of the same par value as any new bonds which they would pay par for in cash.   I cannot say, from reading the evidence, that the common-stock bonus allowed by Kneeland to this class of creditors on cash subscriptions for bonds at par exceeded in value the concession made by the narrow-gauge bondholders in receiving preferred stock for their old bonds.   I cannot find, therefore, that the narrow-gauge bondholders who availed themselves of this subscription opened by Kneeland did not in fact give him par for his bonds.   If that is true then the directors here involved in fact paid par for the bonds, and are not within the statute.

Another reason for holding that the subscription privilege did not involve a purchase of the bonds at less than par by the directors is that the obligation of the company to comply with the contracts of January 23, 1886, did not arise from any action of the directors. The act of consolidation, and the transfer of the narrow-gauge road to it by operation of law from the constituent companies, imposed on it the obligation of those contracts.   The case is this then:  Havemeyer, Stout, Harbeck, Quigley, and Brown, together with all other bondholders of their class, made contracts with Kneeland by which it was agreed that Kneeland should make a construction contract with a consolidated company to be formed out of three constituent companies, and as a term of those contracts Kneeland agreed that of the bonds and stock to be received by him from this construction contract he would sell a certain amount at a certain price to them.   The construction contracts became binding on the consolidated corporation when formed, and afterwards the persons named became directors, and received the bonds and stock from Kneeland on the terms agreed.   Though they received the bonds and stock when they were directors, they took them, not from the company, but from Kneeland, under contracts binding on all parties at the time they became directors.

The proposition that the contracts of January 23, 1886, were binding on the consolidated corporation, without action by its board of directors, is much contested by the counsel for the railroad company and the intervening creditors.   The form of the contracts of January 23, 1886, and of the contracts with the constituent company, are peculiar, in that in both of them Kneeland agrees that the consolidated company shall rebuild the road, and the bondholders in the former and the constituent companies in the latter agree that the consolidated company shall issue the particular securities in payment of the same.   In the former, in certain parts, it is made clear that Kneeland is himself to do the work of construction, and is to receive the bonds, certain preferred stock, and the common stock.   In the latter this is stated with less definiteness, and yet it is perfectly manifest, from the similarity of the provisions, that each constituent company is adopting. so far as it may properly do, the contracts of January 23, 1886, and is accepting the conveyance of its part of the

railroad for the purpose and with the intent to carry out the plan of reorganization, and to put in force the agreements contained in those two contracts. Indeed, knowing, as the corporations must be charged with knowing, that Kneeland held the title to the railroad upon conditions of the contracts of January 23, 1886, neither constituent company could accept title to the part conveyed to it without also assuming the obligations of the contracts of January 23, 1886, so far as they affected it and the consolidated corporation of which it was to be a constituent. "When, however, the contract is made in the name and on behalf of the projected corporation, and is treated as a proposal to such corporation, to be acted upon by it when it comes into existence, then, in the absence of other controlling circumstances, acceptance of benefits under the contract justifies the inference that the corporation has accepted or adopted it." Alger, Prom. Corp. § 208; Battelle v. Pavement Co., 37 Minn. 89, 33 N. W. 327; Mining Co. v. Quintrell, 91 Tenn. 693, 20 S. W. 248. But it is said that by the express provision of the contracts with the constituent companies it was Kneeland, and not the companies, who agreed that the consolidated corporation would rebuild the road and do the other things, and that the constituent companies only agreed that the consolidated company should issue the bonds; but, even so, the constituent companies necessarily consented that the reconstruction should be carried on by agreeing that it should be paid for, because, where one agrees to pay another for work, there is an implied obligation on the part of the one to permit the work to be done.

It seems to me clearly to follow that by express agreement, and, if that is not specific enough, by necessary implication, the constituent companies, in accepting title to the railroad which Kneeland held, subject to the conditions of the contracts of January 23, 1886, assumed the obligations of those contracts. The effect of the consolidation is declared by statute to be the vesting of all the property of the constituent corporations in the consolidated company, and the imposition upon it of liability for all the contracts of the constituents immediately upon the organization of the company by the election of the first board of directors. Rev. St. Ohio, § 3384; Compton v. Railway Co., 45 Ohio St. 592, 16 N. E. 110, and 18 N. E. 380; Railway Co. v. Ham, 114 U. S. 595, 5 Sup. Ct. 1081. When then the first board of directors of the consolidated company was elected, and before it organized or took any action, the contracts of January 23, 1886, were binding on that company.

We thus reach the conclusion that the bonds issued by the railroad company to Kneeland are all of them valid, and that they are not affected either by section 3290 or by section 3313. The findings of fact and the propositions of law upon which this is founded have made it unnecessary to consider the points made by counsel for the bondholders, (1) that these sections do not apply, and were not intended to apply, to the bonds of consolidated railway corporations of Ohio and other states; (2) that the sections render bonds issued in violation of them not absolutely void, but voidable only, at the option of the company, and that the company is estop-

ped to avoid them now; and (3) that the bonds are negotiable, and are in the hands of innocent holders for value, and that the statutes were not intended to defeat the claims of such owners.

The only remaining question as to the bonds is whether they are to be defeated because of Kneeland's fraud in its performance by giving Quigley an interest in the contract. It is probable, as already said, that the company might have rescinded the contract with Kneeland if, during its performance, it had learned of the corrupt agreement between Kneeland and Quigley; but the relation between them after one year of construction, and three years before the completion of the road, ceased, and Kneeland was allowed to continue to the end, receiving his bonds and stock and spending large sums. Finally, in 1891, after bitter controversies had arisen, a full compromise between Kneeland and the company was effected, and all differences were settled. It does not appear that the work of Kneeland was so faulty in construction that fraud in performance can be charged, or that the company had not full information as to the character of the work done when it accepted it as a compliance with the contract. It would be too late now, therefore, even as against Kneeland, and a fortiori as against his vendees, to impeach the validity of the bonds for failure or fraud in the consideration.

The remaining question to be decided arises between the common and preferred stockholders. The latter claim a right to the distribution to them of the surplus, if any, after payment in full of the bonds and all the other debts of the company out of the proceeds of the sale of the road, in preference to the common stockholders, and they, therefore, ask that they be given in the decree for sale the right to complete any bid they may see fit to make, after depositing cash to the amount of the bonds and other debts, by depositing their preferred stock. The basis of the claim is a sentence in the certificates of preferred stock which is as follows: "This stock constitutes a lien upon the property and net earnings of the company next after the company's existing first mortgage." Counsel for the company and the common stockholders maintain—First, that there was no power in the consolidated company to give such a preference as to capital to preferred stockholders; second, that, if such power existed, it was not in fact exercised, because the language of the sentence quoted was not the language of the company; third, that, if it was, it does not give a preference, in distribution of capital as between preferred and common stockholders; and, finally, that, even if it does, it is not for this court to wind up the company and distribute its assets, but it must, on sale of the road, turn over the surplus, if any, after payment of the debts, to the company who is a party hereto, for such a liquidation of its debts and distribution of its assets and settlement of its affairs as may be provided by law. So far as the power of this company to issue preferred stock with this provision is concerned, I think it is settled for this court by the decision in Hamlin v. Trust Co., 47 U. S. App. 422, 437, 24 C. C. A. 271, and 78 Fed. 664. If the question is to be reconsidered, it must be reconsidered in that

court. That court held that, in the absence of a prohibition in the local law or charter, such a preference might be given in preferred stock. No such prohibition in the local law or charter has been called to my attention. The court of appeals decision also construes the language, and declares that it does give a preference as to capital. Upon the question of fact whether this language was inserted fraudulently or without authority I have no doubt. Undoubtedly the form of the certificate was left by the directors to Kneeland, representing the common stock, and Quigley and the bondholders' committees, representing the preferred stock. Kneeland and Quigley conferred about it, and so did Quigley and his colleagues on the bondholders' committees. The certificates were issued in November, 1886, and Kneeland admits that he knew their form then. The stock was listed on the New York Stock Exchange soon after that time, at the request of the directors of the company. From that time until this litigation, not a step was taken to correct the form of the certificate. These facts prove to my mind conclusively that the form of the certificate was as agreed upon by Kneeland and Quigley, and the memories of witnesses as to what were the various forms proposed for the certificates under discussion at the time, and what was the one actually agreed upon, have not the slightest weight with me to overcome the inference to be drawn from the facts above stated.

The final objection, however, made to the request of the preferred stockholders to be allowed to complete their bid by use of the preferred stock, seems to me to be a fatal one. Such a clause in a decree is, in effect, a distribution of the assets of the company among the stockholders, and would necessarily work to the prejudice of those creditors whose claims are not to be paid under the decree for sale. Are there not or may there not be such creditors? In the foreclosure proceeding only judgment creditors are parties. Such a provision in a foreclosure decree would utterly ignore the rights of creditors whose claims are not reduced to judgment. Nor does the creditors' bill necessarily include all creditors of the company. The advertisement for creditors of the company under the creditors' bill only invited, and only could invite, those to come in who wished to participate in the distribution of the proceeds of the sale between creditors, but it did not advise them that the surplus, if any, after sale of the property and payment of claims of those who made themselves parties, was to be divided among the stockholders. Those creditors who have chosen not to come in have the right to rely on this court's paying over the surplus to the company, to whom they can look for payment. Their failure to come in under the creditors' bill, which is a proceeding quasi in rem, only excludes them from any claim against the property, but it does not bar their claims against the company on a winding up, and for a distribution of the surplus realized by the company on the sale of the property under the creditors' bill. For this reason, the application of the preferred stockholders for leave to use preferred stock to complete their bid must be denied.

The application of S. Dana Rose for leave to file an intervening petition as a preferred stockholder is denied. He sought to come

in under the leave granted the Hamlins to bring in other preferred stockholders by advertisement, to unite with them in their answer and cross bill; but he attempted to file a different pleading, and to enlarge the grounds for invalidating the bonds. He does not show that he has not bought his stock just for the purpose of becoming a party to the litigation. He delayed his application until a few days before the time for taking evidence on all issues had closed. He offered to abide by and rest his case on the evidence already taken. Under all the circumstances, he must be content to become a party to the Hamlin answer and cross bill. He is too late to introduce new issues. His application is denied, and his intervening petition, filed without leave, is stricken from the files.

In the view I have taken, it has not been necessary for me to consider whether the defenses to the bonds argued and based on sections 3290 and 3313 of the Ohio Statutes have been properly raised upon the pleadings. Whether they have been properly pleaded or not, they must fail.

A decree for sale will be entered on the foreclosure bill. One has been prepared by counsel for complainant, the Continental Trust Company. It will be entered with some slight alterations. The counsel for Stout & Purdy, the complainants in the creditors' bill, may prepare a decree for sale on the creditors' bill, and it will also be entered. The case will be referred back to the master to report his findings of fact and conclusions of law upon the amount and validity of the claims filed by creditors coming in under the advertisement on the creditors' bill, except as to the claim of the bondholders, the validity and amount of which will be fixed in the decree for sale, and except as to the judgment claim of Stout & Purdy, upon which the creditors' bill is founded. This reference to the master will not delay proceedings under the decree for sale.